UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE OF FLORIDA,

   *Plaintiff*,

   v.                             Case No. 8:24-cv-1041

The BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND
EXPLOSIVES; STEVEN DETTELBACH,
in his official capacity as Director of the
Bureau of Alcohol, Tobacco, Firearms
and Explosives; THE DEPARTMENT
OF JUSTICE; MERRICK GARLAND,
in his official capacity as Attorney General
of the United States; the UNITED STATES
OF AMERICA,

   *Defendants*.
_____/

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. For decades, federal law has made a basic distinction between firearms dealers, who must purchase a federal license to sell firearms, and private individuals making private sales, who need not do so.

2. As part of that scheme, a licensed firearms dealer must maintain records of all his firearms transactions, 18 U.S.C. § 923(g)(1)(A), and allow inspection of those records by the federal government up to once a year, 18 U.S.C. § 923(g)(1)(B)(ii)(I).

3. A firearms dealer must also conduct a background check prior to sale, 18 U.S.C. § 922(t).

4. Private sellers, by contrast, are prohibited from selling to someone whom they "know[] or hav[e] reasonable cause to believe" cannot legally purchase a firearm. *See* 18 U.S.C. § 922(d). But they need not purchase a license, maintain records, be subject to inspection, or obtain access to criminal databases to perform a background check.

5. This distinction is one of common sense. People are generally permitted to sell their private property to their neighbors or other private citizens without navigating a federal bureaucracy. And firearms, unlike most private property, enjoy unique constitutional protections. *See* U.S. Const. amend. II (discussing "the right of the people to keep and bear Arms"); *cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (explaining that "[t]he constitutional right to bear arms . . . is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees" (quotations omitted)).

6. In 2022, Congress amended federal law to clarify when a person is "engaged in the business of selling firearms" and must obtain a federal license. *See* Bipartisan Safer Communities Act (the BSCA), Public Law 117–159, sec. 12002, 136 Stat. 1313, 1324 (2022) (amending 18 U.S.C. § 921(a)(21)(C)).

7. The BSCA was not viewed as a sea change in federal firearms regulation. As its name indicates, it passed in a bipartisan manner, with 15 Republican Senators voting in favor.[1] Those 15 Senators included, for example, Senate Minority Leader

---

[1] https://news.yahoo.com/15-republican-senators-voted-favor-034108926.html.

2

Mitch McConnell and Senator John Cornyn, both of whom the National Rifle Association has given an "A+" rating on gun rights issues.[2]

8. In fact, according to the bill's sponsors, the BSCA only "clarif[ied] who should be licensed" and "eliminat[ed] a gray area in the law" with respect to whether a firearms dealer must earn his principal livelihood from firearms sales.[3]

9. President Biden, however, wanted Congress to go much further. For years, he has been asking Congress to enact so-called "universal background checks,"[4] which would subject every private firearms transaction to federal regulation. Congress has repeatedly declined to do so.

10. Sensing an opportunity, the Biden Administration now seeks to exploit the minor changes to federal law enacted in the BSCA to implement President Biden's preferred policies by executive fiat.

11. Specifically, on April 19, 2024, President Biden's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) finalized its new rule. *See* Definition of "Engaged in the Business" as a Dealer in Firearms (the challenged rule), 89 Fed. Reg. 28,968 (Apr. 19, 2024).

12. The rule purports to "implement" the BSCA. *See* 89 Fed. Reg. at 28,968. But, as the White House admits, the challenged rule reflects the President's

---

[2] https://www.nrapvf.org/campaigns/2014/vote-mcconnell/; https://www.nrapvf.org/campaigns/2014/vote-cornyn/.

[3] https://crsreports.congress.gov/product/pdf/IF/IF12197.

[4] https://www.foxnews.com/politics/biden-says-gun-violence-is-a-national-embarrassment-demands-gop-move-on-background-check-bill.

"directi[ve]" to "the Attorney General to move the U.S. as close to universal background checks as possible without additional legislation."[5]

13. And although the White House frames ATF's actions as merely "clarifying" the BSCA, any regulation that is based on a directive to "move the U.S." in a particular policy direction is, by definition, not merely "clarifying" a statute.[6]

14. The challenged rule, in fact, goes far beyond the plain text of the BSCA. It purports to force thousands of law-abiding gun owners to register as federal firearms dealers and navigate a federal bureaucracy as a precondition to engaging in constitutionally protected activity.

15. The challenged rule is unlawful. In the first instance, ATF does not have authority to promulgate it because ATF's rulemaking authority is carefully circumscribed. But even if it did, the challenged rule improperly attempts to depart from the plain meaning of the BSCA to achieve President Biden's policy goals.

16. As the challenged rule acknowledges, there are "only three States (Florida, Tennessee, and Utah)" that "do not currently require background checks for all private sales" and that "do not rely on Federal law enforcement for their background checks." *See* 89 Fed. Reg. at 29,065. The challenged rule also

---

[5] https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/11/fact-sheet-biden-harris-administration-announces-new-action-to-implement-bipartisan-safer-communities-act-expanding-firearm-background-checks-to-fight-gun-crime/.

[6] https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/11/fact-sheet-biden-harris-administration-announces-new-action-to-implement-bipartisan-safer-communities-act-expanding-firearm-background-checks-to-fight-gun-crime/.

acknowledges that those three States, which perform the background checks themselves, "may be affected by this rule to the extent they have to conduct increased background checks." 89 Fed. Reg. at 29,088.

17. Because implementation of the challenged rule will interfere with Florida's public policy objectives and cost Florida additional resources, the State files this challenge under the Administrative Procedure Act (APA). Florida asks the Court to hold unlawful and set aside the challenged rule.

## PARTIES

18. Plaintiff the State of Florida is a sovereign State and has the authority and responsibility to protect its sovereign prerogatives, its public fisc, and the health, safety, and welfare of its citizens. As the State's Chief Legal Officer, Attorney General Ashley Moody is authorized to represent the interests of the State in civil suits. *See* § 16.01(4), (5), Fla. Stat.

19. Defendants are the United States of America, the Department of Justice (DOJ), its component, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the heads of DOJ and ATF. ATF and DOJ are responsible for implementing and enforcing the challenged rule.

20. Florida sues the United States under 5 U.S.C. §§ 702–06 and 28 U.S.C. § 1346.

21. Florida sues DOJ and ATF under 5 U.S.C. §§ 702–06.

22. Defendant Merrick Garland is U.S. Attorney General and the head of DOJ.

23. Defendant Steven Dettelbach is Director of ATF.

24. Florida sues Defendants Garland and Dettelbach in their official capacities under 5 U.S.C. §§ 702–06, 28 U.S.C. § 1361, and equity.

## JURISDICTION AND VENUE

25. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 2201–02, and 5 U.S.C. §§ 702–06.

26. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff the State of Florida is a resident of every judicial district in its sovereign territory, including this district (and division). *Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022).

## BACKGROUND

### Federal Firearms Regulation

27. Federal law makes it unlawful for any person other than a "licensed dealer" to "engage in the business of . . . dealing in firearms." 18 U.S.C. § 922(a)(1)(A).

28. If a person qualifies as a dealer, he must maintain records of all his firearms transactions, 18 U.S.C. § 923(g)(1)(A), and allow inspection of those records up to once a year, 18 U.S.C. § 923(g)(1)(B)(ii)(I).

29. He also must purchase a federal license and perform background checks before selling firearms. *See* 18 U.S.C. § 922(t).

30. A "dealer," as relevant here, includes any person "engaged in the business of selling firearms at wholesale or retail." 18 U.S.C. § 921(a)(11).

6

31. In order to be "engaged in the business" of selling firearms, a person must satisfy several elements.

32. First, he must "devote[] time, attention, and labor to dealing in firearms." 18 U.S.C. § 921(a)(21)(C).

33. Second, he must do so "as a regular course of trade or business." 18 U.S.C. § 921(a)(21(C).

34. Third, he must do so "to predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C).

35. Finally, he must do so "through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C).

36. In addition to imposing those four requirements, the statute expressly carves out "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C).

37. In 2022, the BSCA made only minor changes to these requirements. Specifically, it imposed the "to predominantly earn a profit standard" referenced above, which previously required that the person have "the principal objective of livelihood and profit." 18 U.S.C. § 921(a)(21)(C) (2021).

38. In other words, a firearms dealer still must (a) devote time, attention, and labor to dealing in firearms, (b) as a regular course of trade or business, (c) through the repetitive purchase and resale of firearms. The main difference is that, if he does all those things, it is enough that he is doing so to "predominantly earn a profit," and the

7

government no longer need prove that these activities are the source of his "livelihood."

### The Challenged Rule

39. Even though the BSCA made only modest changes to federal law, Defendants seek to exploit this minor clarification in order to effect a sea change in federal firearms regulation.

40. The rule states, for example, that "even a single firearm transaction or offer to engage in a transaction, when combined with other evidence . . . , may require a license." 89 Fed. Reg. at 29,091 (quoting 27 C.F.R. § 478.13(b)). The challenged rule asserts this position even though the statute requires a person to engage in the "*repetitive* purchase and resale of firearms" to qualify as a dealer. 18 U.S.C. § 921(a)(21)(C) (emphasis added).

41. Worse still, the challenged rule creates a set of rebuttable "[p]resumptions that a person is engaged in the business as a dealer." 89 Fed. Reg. at 29,091 (quoting 27 C.F.R. § 478.13(c)).

42. The most problematic rebuttable presumption states that, if a person "[r]esells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms," the person is presumed to be a firearms dealer. 89 Fed. Reg. at 29,091 (quoting 27 C.F.R. § 478.13(c)(1)).

43. That presumption utterly swallows the statutory standard. As discussed above, to be a dealer a person must (a) devote time, attention, and labor to dealing in

firearms, (b) do so as a regular course of trade or business, (c) do so to predominantly earn a profit, and (d) engage in the repetitive purchase and resale of firearms. 18 U.S.C. § 921(a)(21)(C).

44. Put differently, the presumption treats the mere fact of reselling firearms, along with an "ability to purchase and resell additional firearms," as prima facie evidence that *all four* elements are met. 89 Fed. Reg. at 29,091 (quoting 27 C.F.R. § 478.13(c)(1)). That approach categorically ignores the first three elements.

45. And even with respect to the fourth element, the challenged rule treats the "purchase and resale of firearms," accompanied by a willingness and ability to purchase and resell more, as the same as engaging in the "*repetitive* purchase and resale of firearms." *Compare* 89 Fed. Reg. at 29,091 (quoting 27 C.F.R. § 478.13(c)(1)), *with* 18 U.S.C. § 921(a)(21)(C). But the word "repetitive" requires activity more frequent and pervasive than contemplated by the challenged rule. *Cf. Weltch v. Astrue*, No. cv-10-154, 2011 WL 1135930, at *12 (D. Or. Mar. 28, 2011) (rejecting the argument that the term "repetitive" merely means "more than once").

46. The challenged rule also obliterates the exception to the definition of "dealer" for "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). The challenged rule accomplishes that by stating that the term "[p]ersonal collection . . . shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit." 89 Fed. Reg. at 29,090 (amending 27 C.F.R. § 478.11).

9

47. But many people who sell, purchase, and exchange firearms to enhance their personal collection or for a hobby do so, in part, in hopes of making money. The same is true of someone who collects antiques, baseball cards, or Beanie Babies. Nowhere in the statute did Congress indicate that a financial motive renders a person categorically ineligible for the personal collection or hobby exception.[7]

### Effect of the Challenged Rule

48. The challenged rule's legal defects have significant practical consequences. Many gun owners buy and then resell firearms. Sometimes they do so only to add to their personal collection. As discussed above, however, sometimes increasing the value of that collection is one of their motives—just as collectors of other items hope their collections will gain value and potentially be resold for a profit.

49. But despite the challenged rule creating a "rebuttable presumption" that these individuals are dealers, they plainly are not under the statute.

50. The increase in background checks caused by the challenged rule will have a significant impact on the State of Florida.

51. The challenged rule recognizes as much. *See* 89 Fed. Reg. at 29,088 (recognizing that States like Florida "may be affected by this rule to the extent they have to conduct increased background checks"); *id.* at 28,993 ("[T]he amended

---

[7] The challenged rule has many additional legal defects. *See Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005) (Easterbrook, J.) ("Complaints initiate the litigation but need not cover everything necessary for the plaintiff to win; factual details and legal arguments come later.").

regulations will increase the number of background checks performed because more dealers will become licensed and run background checks on their customers.").

52. Unlike in many States, Florida conducts background checks at the state level rather than relying on the federal government. Florida does so even though state law does not mandate background checks for firearms sales beyond what federal law requires.

53. Specifically, the Florida Department of Law Enforcement (FDLE) runs a program called the "Firearms Purchase Program," which performs the federally mandated background checks. *See* § 790.065, Fla. Stat.

54. Recently, that program has faced significant hurdles in the form of wait times caused by a backlog of required background checks. In response, FDLE invested significantly in clearing that backlog.

55. Those efforts included additional training, increased efforts on hiring, and increased retention efforts. In addition, FDLE reviewed and updated its policies to streamline its processes.

56. As a result of those efforts, FDLE has significantly reduced the backlog. But the challenged rule threatens to undue that progress.

57. According to one study, one in five gun purchases are private transactions not subject to a background check.[8]

---

[8] https://www.vox.com/policy-and-politics/2017/1/4/14153594/gun-background-check-study.

58. Given that the White House describes the challenged rule as moving "as close to universal background checks as possible,"[9] it is not unreasonable to expect a significant surge in background check requests. Defendants expect that too. *See* 89 Fed. Reg. at 28,993 ("[T]he amended regulations will increase the number of background checks performed because more dealers will become licensed and run background checks on their customers.").

59. That surge will harm the State by frustrating its preferred public policy of eliminating delays in the background check process. "[A] state's 'inability to enforce [its] duly enacted plans clearly inflicts irreparable harm on the State.'" *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039 (M.D. Fla. 2021) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018)).

60. Moreover, the challenged rule will force the State to surge even more resources to clear future backlogs. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1208 (11th Cir. 1989) (explaining that States have standing to challenge federal policies that force them to expend resources).

## CLAIMS

## COUNT 1

### Administrative Procedure Act

61. Florida repeats and incorporates by reference ¶¶ 1–60.

---

[9] https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/11/fact-sheet-biden-harris-administration-announces-new-action-to-implement-bipartisan-safer-communities-act-expanding-firearm-background-checks-to-fight-gun-crime/.

62. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

63. The challenged rule is contrary to law for several reasons.

64. First, ATF does not have the broad rulemaking authority contemplated by the challenged rule.

65. In 1986, Congress passed the Firearm Owners' Protection Act, Pub. L. 99-308, 100 Stat. 449 (May 19, 1986). That legislation appears to have been motivated, in part, by Congress's desire to rein in ATF. *See, e.g.*, S. Rep. No. 98-583, at 3 (1984) (discussing "the urgent need for changes [to federal firearms law] to prevent the recurrence of [ATF] abuses").

66. Among the changes to federal law was the following change to ATF's rulemaking authority. "(a) The [Attorney General][10] may prescribe **only** such rules and regulations ~~as he deems reasonably~~ **as are** necessary to carry out the provisions of this chapter." *See* 100 Stat. 459 (amending 18 U.S.C. § 926).[11]

67. In order to give meaning to this change, ATF's rulemaking authority is best understood as authorizing only regulations that are truly "necessary."

---

[10] The Attorney General has delegated his authority to the head of ATF. *See* 89 Fed. Reg. at 28,969 (discussing the delegation).

[11] The strike through and bold font do not appear in the text of the legislation but were added by Florida to illustrate the effect of the amendment.

"Necessary" is a "word of limitation" and often synonymous with "required," "indispensable," and "essential." *Vorcheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018) (quotations omitted).

68. An example of a "necessary" regulation would be one implementing 18 U.S.C. § 923(d)(1)(F)(iii), which requires use of "a form to be prescribed by the Attorney General."

69. But a general desire to "clarify[]" the BSCA is not sufficient to trigger ATF's rulemaking authority.[12]

70. Second, as described above, the challenged rule goes far beyond the plain meaning of the statute.

71. Given the interpretive canons that apply, ATF should have, if anything, defined "dealer" narrowly rather than trying to "move the U.S. as close to universal background checks as possible."[13]

72. The challenged rule reaches the outer bounds of the Commerce Clause, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps. of Eng'rs*, 531 U.S. 159, 172 (2001), interprets text for which violations carry criminal penalties, *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004), impacts freedoms protected by the Second Amendment,

---

[12] https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/11/fact-sheet-biden-harris-administration-announces-new-action-to-implement-bipartisan-safer-communities-act-expanding-firearm-background-checks-to-fight-gun-crime/.

[13] https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/11/fact-sheet-biden-harris-administration-announces-new-action-to-implement-bipartisan-safer-communities-act-expanding-firearm-background-checks-to-fight-gun-crime/.

*United States v. Rehlander*, 666 F.3d 45, 47 (1st Cir. 2012), and deals with issues of vast political significance, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

73. The challenged rule also fails to satisfy the APA's requirement of reasoned decisionmaking. ATF failed to justify its radical departure from past practice or to adequately consider reliance interests, including Florida's decision to take on the significant task of conducting background checks at the state level. Further, on information and belief, the challenged rule is not supported by the administrative record.

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Hold unlawful and set aside, pursuant to the APA, the challenged rule.

b) In the alternative, if the Court denies (a), permanently enjoin Defendants from enforcing the challenged rule in Florida.

c) Award Florida costs and reasonable attorney's fees.

d) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

/s/ *James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

NATALIE P. CHRISTMAS (FBN 1019180)
SENIOR COUNSELOR

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*