## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**STATE OF FLORIDA**,

                          Plaintiff,

        v.

**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES**, *et al.*,

                          Defendants.

Case No. 8:24-cv-1041-CEH-NHA

## DEFENDANTS' MOTION TO DISMISS COMPLAINT

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Defendants Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Steven Dettelbach, in his official capacity as Director of ATF; the Department of Justice; Merrick Garland, in his official capacity as Attorney General of the United States; and the United States of America (collectively, "Defendants"), hereby move to dismiss the Complaint for Declaratory and Injunctive Relief, ECF No. 1 ("Compl." or "Complaint"), filed by Plaintiff State of Florida.  For the reasons stated in the Memorandum of Law below, the Court should dismiss the Complaint for lack of subject matter jurisdiction.

## MEMORANDUM OF LAW

In the Gun Control Act (GCA), Congress required anyone engaged in the business of dealing firearms to obtain a federal firearms license.  When transferring firearms, licensees must verify the transferee's identity, run a background check (and deny the transfer if the background check reveals that the transferee is prohibited by law from receiving or possessing the firearm), and maintain records that can be used

to trace the firearm if it is later recovered from a crime scene. These requirements serve the "twin goals" of "keep[ing] guns out of the hands of criminals and others who should not have them, and . . . assist[ing] law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014). Recognizing the harm to public safety caused by unlicensed dealing in firearms, Congress recently amended the GCA *via* the Bipartisan Safer Communities Act (BSCA) to expand the category of conduct that constitutes engaging in the business of dealing.

In the GCA, Congress vested the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) with authority to promulgate regulations necessary to carry out the GCA's provisions. In the Rule at issue in this case,[1] ATF exercised that authority by further clarifying the term "engaged in the business" of dealing in firearms and setting forth conduct that presumptively does, or does not, rise to the level of engaging in the business of dealing. In this lawsuit, the State of Florida claims that the Rule violates the Administrative Procedure Act (APA) and asks this Court either to hold the Rule unlawful and set it aside, or to enjoin its enforcement.

Florida's claim is meritless, and Defendants intend to defend the lawfulness of the Rule vigorously should this case progress to resolution of the merits. But the case should not get that far because Florida lacks standing to challenge the Rule, a vital requirement to invoke the subject matter jurisdiction of a federal court. It is Florida's burden to plead a plausible basis for standing, and Florida has not done so. Florida's

---

[1] Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

standing theory articulated in the Complaint is that it conducts background checks on firearms sales, the Rule will increase the number of background checks, and this increase will impose costs and administrative burdens on the state.

This theory fails because any harm to Florida's government from conducting background checks is self-inflicted, resulting entirely from Florida's voluntary decision to conduct background checks itself, rather than relying on the federal government. The Federal Bureau of Investigation (FBI) operates the federal firearms background check system and offers full background check services to states for free. The majority of states rely on the FBI to conduct background checks, and those states incur no costs or burdens relating to background checks. The federal government has not forced Florida to conduct background checks; Florida has voluntarily taken on that burden.

It is well established that plaintiffs cannot "'manufacture standing' . . . by inflicting harm on themselves" by choosing to expend resources absent a cognizable injury. *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 640 (11th Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)). As then-Judge Ruth Bader Ginsburg explained, an injury "insofar as it is incurred voluntarily, is not an injury that fairly can be traced to the challenged action, as required by Supreme Court decisions interpreting Article III of the Constitution. Rather, to the extent [an] injury is self-inflicted, it is so completely due to the complainant's own fault as to break the causal chain." *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (Ginsburg, R.B., J.) (cleaned up). Florida's self-inflicted injury does not create standing.

3

I.      **Statutory and Regulatory Background**

A.     **The Gun Control Act of 1968**

Congress enacted the Gun Control Act, 18 U.S.C. § 921 *et seq.* (GCA), in 1968 to promote public safety and curb crime and violence caused by the misuse of firearms. "The twin goals of [the GCA's] comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." *Abramski*, 573 U.S. at 180. The GCA prohibits various groups of people, including felons, fugitives from justice, and those under domestic violence restraining orders, from receiving or possessing firearms with a nexus to interstate commerce.  *See* 18 U.S.C. § 922(g).  In restricting the access of criminals and other dangerous individuals to firearms, "the focus of the federal scheme is the federally licensed firearms dealer." *Huddleston v. United States*, 415 U.S. 814, 825 (1974).

Federal firearms licensees (FFLs) must comply with various obligations when transferring firearms to non-licensees, to prevent prohibited persons from obtaining firearms.  "The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.  In most cases, a transferee must "appear in person at the licensee's business premises" when acquiring a firearm.  18 U.S.C. § 922(c).  The licensed dealer must obtain the transferee's "name, age, and place of residence," *id.* § 922(b)(5), and must "verif[y] the identity of the transferee by examining a valid identification document," *id.* § 922(t)(1)(D).  Transferees must fill out a form certifying that they are

4

not prohibited by federal law from receiving or possessing firearms.[2]  The dealer must submit information about the transferee to the National Instant Criminal Background Check System (NICS), which then conducts a background check on the transferee and will deny the transaction if the background check reveals that the transferee is prohibited from receiving or possessing the firearm.  18 U.S.C. § 922(t)(1).[3]

The FBI operates the NICS.  States may rely on the FBI to provide full services to FFLs relating to background checks; 31 states, five U.S. territories, and the District of Columbia do so.  *See* FBI, About NICS, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics (last accessed July 25, 2024).  In those jurisdictions, the FBI conducts background checks, and the state government incurs no costs or administrative burdens related to background checks.  States may also voluntarily serve as a point of contact with FFLs for background checks; in such states, FFLs contact the state government regarding background checks, and states conduct background checks by querying law enforcement databases, including federal databases maintained by the FBI.  *See* 28 C.F.R. §§ 25.2, 25.6.  Most states that have chosen to serve as points of contact for background checks require background checks for all private firearms sales, unlike the federal government (which requires background checks only for firearms sales by FFLs); of the states that do not require

---

[2]  *See* ATF Form 4473, Firearms Transaction Record (revised Aug. 2023), https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.
[3]  The NICS was established pursuant to the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).

background checks for all private firearms sales, only Florida and two other states serve as point of contact for all background checks.  *See* Rule, 89 Fed. Reg. at 29,065; Compl. ¶ 16.  Since the NICS became operational in 1998, it has conducted more than 443 million background checks, and more than 2.1 million firearms transactions have been denied.  FBI, National Instant Criminal Background Check System 2022 Operational Report, at 14-15, https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view (last accessed July 25, 2024).

FFLs also maintain records of acquisitions and dispositions of firearms, which enable tracing of firearms recovered from crime scenes.  18 U.S.C. §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-478.134.  When a firearm is recovered from a crime scene, law enforcement (often state or local) can submit a request to ATF's National Tracing Center to trace the firearm.  *See* ATF, National Tracing Center, https://www.atf.gov/firearms/national-tracing-center (last accessed July 25, 2024). ATF's tracing process typically involves querying the records maintained by FFLs in order to trace the firearm to its first retail purchaser.  Firearms tracing, which is enabled by the records maintained by FFLs, helps all levels of law enforcement solve crimes involving firearms. *See* Rule, 89 Fed. Reg. at 28,988.

Each of the above-described obligations relating to the disposition of firearms applies only to transfers by FFLs.  Therefore, the GCA's standard for when a person or business must obtain a federal firearms license to deal firearms has vital public safety implications.  Since the GCA's original enactment, Congress has prohibited individuals from "engag[ing] in the business of . . . dealing in firearms" without a

federal firearms license.  18 U.S.C. § 922(a)(1)(A).  But if a person is not engaged in the business of dealing in firearms, that person may transfer a firearm without conducting a background check, keeping transaction records, or complying with other obligations required of FFLs.[4]

When Congress first enacted the GCA, Congress did not further define what it means to engage in the business of dealing firearms.  In 1986, as part of the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ("FOPA"), Congress added a statutory definition of engaged in the business for the first time.  As applied to a dealer in firearms other than a gunsmith or pawnbroker, FOPA defined "engaged in the business" as follows:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

*Id.* § 101 (amending 18 U.S.C. § 921).

In 2022, Congress amended the GCA by enacting the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022).  Congress enacted the BSCA in the wake of a series of tragic mass shootings.  In one of those mass shootings, which occurred between Midland and Odessa, Texas, an FFL refused to transfer a firearm to the perpetrator based on mental illness, but the perpetrator then unlawfully

---

[4] Certain requirements apply even to firearms transfers by unlicensed individuals.  For example, no person may transfer a firearm if that person knows or has reasonable cause to believe that the transferee is legally prohibited from receiving or possessing that firearm.  *See* 18 U.S.C. § 922(d).

obtained the firearm used in the shooting from an unlicensed dealer who did not conduct a background check.  That dealer later pleaded guilty to unlawful unlicensed firearms dealing.  *See* Rule, 89 Fed. Reg. at 28,971-72 & nn.26-29.

As relevant here, the BSCA expanded the GCA's definition of engaged in the business of dealing in firearms.  The BSCA replaced the phrase "with the principal objective of livelihood and profit" with the phrase "to predominantly earn a profit," and defined that phrase in a separate subsection, which clarifies that the term "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain."   136 Stat. at 1324-25, § 12002.  The BSCA's sponsors intended to address potential confusion about the GCA's application to individuals who deal in firearms with the intent to earn profit, but possibly not as a principal source of livelihood, to "clarify who should be licensed, eliminating a 'gray' area in the law, ensuring that one aspect of firearms commerce is more adequately regulated."  Rule, 89 Fed. Reg. at 28,972 (quoting William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms    Dealers    "Engaged    in    the    Business"*    2    (2022), https://crsreports.congress.gov/product/pdf/IF/IF12197/2); *see also id.*  at 28,972 n.31 (collecting statements of the BSCA's sponsors).

**B.    The Final Rule**

ATF is a bureau within the Department of Justice responsible for implementing and enforcing federal firearms laws, including the GCA.  Congress has vested in the Attorney General the authority to prescribe regulations "necessary to carry out the provisions of" the GCA, 18 U.S.C. § 926(a), and Congress and the Attorney General

have delegated that authority to ATF.

ATF published the Final Rule on April 19, 2024. ATF explained that the Rule "implement[s]" the BSCA's "statutory change" to the definition of engaged in the business, Rule, 89 Fed. Reg. at 28,968, and thereby furthers Congress's design "to improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime," *id.* at 28,987. The Rule also "provide[s] clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms. *Id.* at 28,968.

The Rule sets forth a definition of being engaged in the business of dealing that is substantively identical to the statutory definition:

| GCA, 18 U.S.C. § 921(a)(21)(C) | Rule, 89 Fed. Reg. at 29,091 |
|---|---|
| The term "engaged in the business" means— . . . as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms; | §478.13 Definition of "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker." <br> (a) *Definition.* A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. The term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms. |

The Rule also defines various subsidiary terms in the GCA's definition of "engaged in the business," consistent with statutory text and ordinary usage. For

9

example, the term "Dealer" includes "[a]ny person engaged in the business of selling firearms at wholesale or retail . . . wherever, or through whatever medium, they are conducted," including at "a gun show," a "flea market," "by mail order," "over the internet," or "through the use of other electronic means." *Id.* at 29,090 (27 C.F.R. § 478.11).

The Rule introduces a standalone section, 27 C.F.R. § 478.13, to define "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker." Rule, 89 Fed. Reg. at 29,090-91. Subsection (a) mostly repeats the statutory definition contained in 18 U.S.C. § 921(a)(21)(C), while also clarifying that being engaged in the business covers consignment-type auctions but not estate-type auctions. *Id.* at 29,091 (27 C.F.R. § 478.13(a)).

Subsection (b) states that whether someone is engaged in the business of dealing "is a fact-specific inquiry," and that while "[s]elling large numbers of firearms . . . may be highly indicative of business activity, . . . there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement." *Id.* (27 C.F.R. § 478.13(b)). This subsection reflects ATF's sensible conclusion that defining "engaged in the business" through a bright-line threshold of number of transactions would be inconsistent with the GCA's text and would necessarily be both underinclusive and overinclusive. *See id.* at 29,086. To clarify the GCA's application, subsection (c) sets forth a number of fact patterns that give rise to rebuttable presumptions "[i]n civil and administrative proceedings" (but not in criminal proceedings) that "a person shall be presumed to be engaged in the business of dealing

in firearms." *Id.* at 29,091 (27 C.F.R. § 478.13(c)).  For example, a person is presumed to be engaged in the business of dealing firearms when the person repetitively purchases for the purpose of resale stolen firearms, or resells or offers for resale stolen firearms.  *Id.* (27 C.F.R. § 478.13(c)(2)(ii)(A)).  These presumptions "are supported by the Department's investigative, regulatory, and enforcement experience, as well as conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business.'"  *Id.* at 28,977; *see also id.* at 28,977-79 nn.72-73, 74-77, 79-83 (citing case law and examples of federal prosecutions supporting these presumptions).

Subsection (d) clarifies the application of the statutory term "predominantly earn a profit."  It starts by repeating the statutory definition in 18 U.S.C. § 921(a)(22), which provides that the term "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," then clarifies that "a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms."  Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)(1)).  It then sets forth fact patterns giving rise to rebuttable presumptions in civil and administrative proceedings (but not in criminal proceedings) that a person has the intent to predominantly earn a profit.  *Id.* (27 C.F.R. § 478.13(d)(2)).  For example, a person is presumed to have intent to predominantly earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale.  *Id.* (27 C.F.R. § 478.13(d)(2)(ii)).  ATF explained that these presumptions are supported by decades of case law arising before the

BSCA's expansion of the statutory language, and enforcement experience. *See id.* at 28,981-82 & nn.97-104. The Rule expressly provides that the Rule's presumptions do not apply in criminal proceedings. *Id.* at 29,092 (27 C.F.R. § 478.13(h)).

The Rule also lists categories of conduct that are not to be presumed to be engaging in the business of dealing firearms, and can be used to rebut the Rule's presumptions, such as reselling or transferring firearms "[o]ccasionally to a licensee or to a family member for lawful purposes." *Id.* (27 C.F.R. § 478.13(e), (f)).

The Rule took effect on May 20, 2024. *Id.* at 28,968.

## II. Florida's Complaint

On May 1, 2024, Florida filed its Complaint against Defendants. *See generally* Compl. Florida brings a single claim, that the Rule violates the APA. *See id.* ¶¶ 61-73. In support of that claim, Florida contends that ATF lacked authority to promulgate the Rule, *id.* ¶¶ 64-69, the Rule goes beyond the text of the GCA, *id.* ¶¶ 70-72, and the Rule fails the APA's requirement of reasoned decisionmaking, *id.* ¶ 73. Florida asks the Court to hold unlawful and set aside the Rule, or alternatively, to permanently enjoin Defendants from enforcing the Rule in Florida. *Id.*, Prayer for Relief, §§ a-b. In support of its standing, Florida alleges that the Rule will cause an "increase in background checks," which will impose costs and administrative burdens on Florida to conduct those background checks. *Id.* ¶¶ 50-60.

## LEGAL STANDARD

A Rule 12(b)(1) motion to dismiss tests the Court's subject matter jurisdiction. On a facial Rule 12(b)(1) motion, such as this one, the Court "assess[es] if the

complaint sufficiently alleges a basis for jurisdiction." *Seiger v. M&M Fin. Invs. Int'l, Inc.*, No. 8:16-cv-2139-T-36AEP, 2017 WL 3971451, at *2 (M.D. Fla. Sept. 8, 2017). "[A]t the motion-to-dismiss stage," a plaintiff bears "the burden of alleging facts that plausibly establish [its] standing." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-84 (2009)). Although a court assessing the plausibility of a complaint must "assume [the] veracity" of "well-pleaded factual allegations," that "tenet . . . is inapplicable to legal conclusions," which "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678-79. A "conclusory allegation is simply not enough" to establish standing. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 933 (11th Cir. 2020) (en banc).

## ARGUMENT

### I.   Florida Fails to Plead a Plausible Basis for Standing

This Court lacks subject matter jurisdiction because Florida fails to plead facts that plausibly establish its standing to challenge the Rule. The doctrine of standing is grounded in Article III of the Constitution, which "confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380. A plaintiff seeking an injunction against government action "must demonstrate a substantial risk that, in the near future, [it] will suffer an injury that is traceable to a Government defendant and redressable by

the injunction [it] seek[s]." *Murthy v. Missouri*, 144 S. Ct. 1972, 1981 (2024). These requirements ensure that federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). "Federal courts can only review statutes and executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law.'" *Murthy*, 144 S. Ct. at 1985 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)).

Florida's Complaint raises a single standing theory, that the Rule will cause an "increase in background checks," Compl. ¶ 50, that will impose costs and administrative burdens on Florida's government, *id.* ¶¶ 50-60.[5] As an initial matter, the BSCA broadened the statutory definition of being "engaged in the business," and any resulting increase in background checks is fairly traceable to the statute — which Florida does not challenge — rather than the Rule.

More fundamentally, Florida's standing theory fails because any burdens Florida suffers in conducting background checks are entirely voluntary and self-inflicted. *See Clapper*, 568 U.S. at 402 (a plaintiff "cannot manufacture standing by choosing to make expenditures" in the absence of a cognizable injury). In states where

---

[5] Because it is Florida's "burden" to "alleg[e] facts that plausibly establish [its] standing," *Trichell*, 964 F.3d at 996, Florida cannot oppose dismissal by raising new standing theories that are not supported by allegations in the Complaint. *See Izydorek v. Unum Grp.*, No. 8:20-cv-247-T-33CPT, 2020 WL 5083831, at *3 (M.D. Fla. Aug. 26, 2020) ("Because these allegations are not in the amended complaint, the new allegations in Izydorek's response cannot defeat dismissal of the amended complaint."); *Huls v. Llabona*, 437 F. App'x 830, 832 n.5 (11th Cir. 2011) (declining to consider argument raised "for the first time in [plaintiff's] response to [defendant's] motion to dismiss").

the FBI conducts background checks, the FBI performs the full suite of services relating to background checks at no cost to the state.  That is, FFLs contact the FBI to request a background check, the FBI conducts the background check, the FBI communicates the result of the background check to the FFLs, and the FBI handles all other administrative tasks relating to background checks.  *See generally* 28 C.F.R. §§ 25.1-25.11 (FBI regulations regarding NICS).  The majority of states rely on the FBI to perform these services, and those states bear no costs or administrative burdens relating to background checks.  *See* FBI, About NICS, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics; Compl. ¶ 52 (conceding that "many States . . . rely[] on the federal government" to conduct background checks).

Florida has made the voluntary decision to add a layer of bureaucracy between FFLs and the NICS, such that a Florida agency serves as the point of contact with FFLs in Florida and then conducts background checks by querying the same databases that the FBI checks when conducting background checks.  *See* Compl. ¶¶ 52-53.  But any harms Florida suffers from conducting background checks result from Florida's voluntary decision to perform services that the federal government is willing to perform (and does perform for the majority of other states) for free.

The Eleventh Circuit has repeatedly held that self-inflicted harms cannot create standing.  Drawing on recent Supreme Court precedent, the Eleventh Circuit has held that plaintiffs cannot "'manufacture standing' by inflicting harm on themselves" by choosing to expend resources absent a cognizable injury.  *City of S. Miami*, 65 F.4th at 640 (quoting *Clapper*, 568 U.S. at 402); *see also Swann v. Sec'y of State of Ga.*, 668 F.3d

15

1285, 1288 (11th Cir. 2012) ("a controversy is not justiciable when a plaintiff independently caused his own injury"); *Pevsner v. E. Air Lines, Inc.*, 493 F.2d 916, 918 (5th Cir. 1974) (rejecting standing based on "self-inflicted" injury)[6]; *McCall v. Publix Super Mkts., Inc.*, No. 8:22-cv-584-MSS-CPT, 2023 WL 2362542, at *7 (M.D. Fla. Feb. 28, 2023) (rejecting standing based on "self inflicted" injury and citing similar recent district court cases).

Other circuits agree. *See*, *e.g.*, *Colorado v. U.S. EPA*, 989 F.3d 874, 888 (10th Cir. 2021) (holding that a state's "self-inflicted" injury "resulting from" its "legislative decision" was "not legally cognizable"); *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 961 (8th Cir. 2011) ("A plaintiff who causes its own injury does not satisfy the traceability prong."); *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 518 (7th Cir. 2010) (rejecting standing based on "entirely self-inflicted" injury); *Bhd. of Locomotive Eng'rs & Trainmen, a Div. of Rail Conf.-Int'l Bhd. of Teamsters v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006) (a "self-inflicted" injury "was not in any meaningful way 'caused' by the [defendant]" and was "therefore insufficient to confer standing upon the [plaintiff]"); *Petro-Chem Processing*, 866 F.2d at 438 ("[An injury] insofar as it is incurred voluntarily, is not an injury that fairly can be traced to the challenged action, as required by Supreme Court decisions interpreting Article III of the Constitution.  Rather, to the extent this injury is self-inflicted, it is so completely due to the complainant's own fault as to break the causal chain.") (cleaned up).

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (Fifth Circuit decisions from before September 30, 1981 constitute binding precedent of Eleventh Circuit).

In particular, alleged harms resulting from a plaintiff state's legislative decision to expend resources cannot serve as a basis for standing.  In *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), Pennsylvania sued New Jersey to challenge a New Jersey law that taxed income of nonresidents (including Pennsylvania residents) derived from work in New Jersey, *id.* at 662-63.  Pennsylvania claimed it was harmed financially because Pennsylvania law provided residents with a tax credit for taxes paid to New Jersey, but the Supreme Court rejected that argument because "[t]he injur[y] to [Pennsylvania's] fiscs w[as] self-inflicted, resulting from decisions by [its] state legislature[]. . . . [N]othing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey.  No State can be heard to complain about damage inflicted by its own hand."  *Id.* at 664.  So too, here, Florida's injury is self-inflicted, resulting from decisions by its legislature.  Even assuming for the sake of argument that the Rule (rather than statutory amendments in the BSCA) will lead to increased background checks in Florida, the Rule does not require Florida to incur costs or burdens to conduct those background checks.  The federal government is willing and able to conduct those background checks for free.  Florida cannot "be heard to complain about damage inflicted by its own hand," *id.*, from its decision to voluntarily take on the burden of conducting background checks.

Notably, another district court has already cast doubt on Florida's standing theory in a lawsuit involving this Rule.  In *Kansas v. Garland*, No. 6:24-cv-01086-TC-TJJ, 2024 WL 3360533 (D. Kan. July 10, 2024), *appeal filed,* No. 24-3101 (10th Cir. July 22, 2024), a group of states (and some other plaintiffs) challenged the same Rule

at issue in this case.  Two states, Tennessee and New Hampshire, raised the same standing theory that Florida raises, that the Rule injured them by increasing their burdens to conduct background checks.  *See* Compl. for Declaratory & Injunctive Relief ¶¶ 95-111, 114, *Kansas*, ECF No. 1.[7]  In denying plaintiffs' motion for preliminary injunction, the court concluded that plaintiffs' "struggle" to "persuasively answer [the] question" of their standing "undermine[d] their ability to make a strong showing that they are likely to succeed on the merits," as necessary for a preliminary injunction.  *Kansas*, 2024 WL 3360533, at *4.  Addressing Tennessee's and New Hampshire's background check burden theory, the court explained, "those burdens are voluntary, at least in the first instance, so they are unlikely to suffice as injuries-in-fact."  *Id.* at *5 n.3 (citing *Clapper*, 568 U.S. at 418).  Although this decision was a preliminary rather than a final resolution of standing, the court's skepticism was well-grounded in case law rejecting standing based on self-inflicted injuries.

Another court granted a preliminary injunction to several states (and several other plaintiffs) challenging the Rule, holding that those states had established standing.  *Texas v. ATF*, No. 2:24-CV-089-Z, 2024 WL 2967340 (N.D. Tex. June 11, 2024), *appeal filed*, No. 24-10612 (5th Cir. July 9, 2024).  Defendants respectfully disagree with the *Texas* order and have appealed it, but in any event, the order is inapposite.  In *Texas*, the court found standing based on the theory that the Rule would

---

[7] Like Florida, Tennessee serves as point of contact for all firearm background checks; New Hampshire serves as point of contact for handgun background checks.  *See* FBI, About NICS, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics.

reduce taxes collected by the states on firearms sales and gun shows, which the court found was supported by declarations submitted the state plaintiffs. *Id.* at *3-4. Because Florida did not raise such a theory in its Complaint or allege facts supporting that theory, Florida cannot oppose dismissal of the Complaint based on that theory. *See supra*, n.5. Moreover, two other district courts have rejected or cast doubt on the reduced sales-tax theory of standing. First, the *Kansas* case was originally filed in the Eastern District of Arkansas, but that court transferred the case to the District of Kansas based on improper venue after dismissing plaintiff State of Arkansas for lack of standing, holding that Arkansas's claimed injuries from reduced taxes were "vague and speculative." *Kansas v. Garland*, No. 2:24-cv-88-JM, 2024 WL 2384611, at *2 (E.D. Ark. May 23, 2024). Second, after *Kansas* was transferred, the Kansas district court concluded that the remaining state plaintiffs' "speculative sales-tax theory" of standing could not support a preliminary injunction because it "depend[ed] on a speculative chain with many uncertain links." *Kansas*, 2024 WL 3360533, at *5.

Florida also argues that a potential "surge" in background checks allegedly caused by the Rule "will harm the State by frustrating its preferred public policy of eliminating delays in the background check process," Compl. ¶ 59, because a state agency has undergone efforts to "reduce[] the backlog" in conducting background checks, *id.* ¶ 56. The fact that a federal regulation does not suit Florida's policy preferences is insufficient to confer standing because "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *All. for Hippocratic Med.*, 602 U.S. at 381.

Moreover, any claimed harm resulting from Florida's "public policy" objection to the Rule is self-inflicted. Florida's allegation that it objects to predicted delays caused by more background checks is just another way of stating that Florida will expend resources on conducting additional background checks, and it wishes to avoid doing so. As explained above, alleged harms from the burden of conducting background checks are noncognizable because they are voluntary and self-inflicted. Any "backlog" or "delays" that Florida's government experiences in conducting background checks results from Florida's decision to take on those burdens. Because that alleged injury "is incurred voluntarily, . . . it is so completely due to [Florida's] own fault as to break the causal chain." *Petro-Chem Processing*, 866 F.2d at 438 (citation omitted).

None of Florida's other allegations plausibly establish standing. Florida contends that the Rule will have "significant practical consequences" on "gun owners" who "buy and then resell firearms." Compl. ¶ 48. This allegation fails to establish standing for two reasons. First, a "conclusory allegation is simply not enough" for standing. *Muransky*, 979 F.3d at 933. Second, the Supreme Court has squarely held that in a lawsuit against the federal government, a state cannot establish standing by asserting injuries of its residents, because "States do not have 'standing as *parens patriae* to bring an action against the Federal Government.'" *Murthy*, 144 S. Ct. at 1997 (quoting *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023)).

Florida cites two cases in support of standing, but both are inapposite. Florida cites *Florida v. Nelson*, 576 F. Supp. 3d 1017 (M.D. Fla. 2021), which reasons that "a

state's inability to enforce [its] duly enacted plans clearly inflicts irreparable harm on the State," *id.* at 1039 (citation omitted); *see* Compl. ¶ 59.  But Florida points to nothing "duly enacted" by Florida's legislature that it is unable "to enforce" because of the Rule.[8]  Florida also cites *Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989), which it claims supports the proposition that "States have standing to challenge federal policies that force them to expend resources."  Compl. ¶ 60.  In *Chiles*, the Eleventh Circuit stated in dicta that if Florida's governor had been forced to call out the National Guard to quell a riot caused by violence in a federal detention facility, that expenditure of resources would qualify as an injury in fact for a suit alleging mismanagement of the federal facility, but the court rejected the allegation of future riots as "too speculative to confer standing."  865 F.2d at 1208.  *Chiles* lends no support to the notion that a state can create standing by voluntarily deciding to incur resources performing services that the federal government is willing and able to perform at no cost to the state.

## CONCLUSION

The Court should dismiss the Complaint for lack of subject matter jurisdiction.

---

[8] By contrast, in *Nelson*, the federal government imposed a requirement on employees of certain federal contractors to become vaccinated against COVID-19, which the court concluded would prevent Florida from enforcing duly enacted state statutes that prohibited employers from imposing vaccination requirements on employees.  *See* 576 F. Supp. 3d at 1032.

Dated: July 29, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs
Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
KERI L. BERMAN
ZACHARY W. SHERWOOD
Trial Attorneys
Civil Division
Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 532-3114
Fax: (202) 616-8470
Email:
jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*

## Local Rule 3.01(g) Certification

I hereby certify that I conferred regarding this motion with Plaintiff's counsel James

H. Percival on July 26, 2024, via email.  Plaintiff's counsel indicated that Plaintiff

opposes this motion.

*/s/ Jeremy S.B. Newman*
Jeremy S.B. Newman
*Attorney for Defendants*