UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:24-cv-1041-CEH-NHA

STATE OF FLORIDA,

    Plaintiff,

v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

    Defendants.

_____

### FLORIDA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

In this suit, Plaintiff the State of Florida (Florida) challenges a new rule issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).[1] Defendants move to dismiss solely on standing and do not, at this stage, contend that Florida fails to state a claim. *See* Doc. 15 at 1.

This Court should deny Defendants' motion. Much of Defendants' motion quibbles with Florida's factual allegations, which the Court must accept as true. And Defendants' legal arguments against Florida's standing give short shrift to the State's right to protect its public fisc and vindicate the duly enacted plans of its Legislature.

For these reasons, and those that follow, the Court should deny the motion.

---

[1] Florida also sues other government entities and actors, such as ATF's parent agency the Department of Justice and the head of ATF in his official capacity. Florida refers to these parties collectively as either "Defendants" or "ATF."

1

## BACKGROUND

Florida aims not to rehash its entire 19-page amended complaint for purposes of this motion. *See* Doc. 13. But the State wishes to emphasize a few points.

This suit challenges a rule issued by ATF on April 19, 2024. *See* Doc. 13 ¶ 11 (citing Definition of "Engaged in the Business" as a Dealer in Firearms (the challenged rule), 89 Fed. Reg. 28,968 (Apr. 19, 2024)). The challenged rule implements a new federal law signed in 2022, which clarified when a person is "engaged in the business of selling firearms" and must obtain a federal license. *See* Doc. 13 ¶ 6 (citing the Bipartisan Safer Communities Act (the BSCA), Public Law 117–159, sec. 12002, 136 Stat. 1313, 1324 (2022) (amending 18 U.S.C. § 921(a)(21)(C))).

Florida alleges that "the challenged rule . . . goes far beyond the plain text of the BSCA" and "force[s] thousands of law-abiding gun owners to register as federal firearms dealers." Doc. 13 ¶ 14. In support of its standing, Florida asserts three injuries. *See* Doc. 13 ¶¶ 48–76.

First, the State asserts that it has lost, and will lose, tax revenue as a result of decreased sales of admission tickets to gun shows. Doc. 13 ¶¶ 51–57. This asserted injury is not based on a reduction in general income tax revenue but on the loss of a specific tax that targets admissions tickets. *See* Doc. 13 at 12 n.8 (discussing § 212.04(1)(b), Fla. Stat., which imposes a 6 percent sales tax on admissions tickets). In support of this standing theory, the State makes specific allegations regarding declining gun show attendance since the challenged rule went into effect and subjected these gun shows to increased regulation. *See* Doc. 13 ¶¶ 54–57.

Second, the State asserts an impact from "[t]he increase in background checks caused by the challenged rule." *See* Doc. 13 ¶¶ 58–67. Defendants concede the existence of this impact. *See* Doc. 13 ¶ 66 (quoting the challenged rule, which states that "[t]he amended regulations will increase the number of background checks performed because more dealers will become licensed and run background checks on their customers"). Defendants also concede that States that have a statutory scheme like Florida's will bear the brunt of this change. *See* Doc. 13 ¶ 16 (quoting the challenged rule, which acknowledges that States like Florida, which "do not rely on Federal law enforcement for their background checks," "may be affected by this rule to the extent they have to conduct increased background checks").

Third, the State asserts a sovereign injury in the form of "pressur[e] . . . to change its laws governing background checks." *See* Doc. 13 ¶¶ 68–76. This injury, like the second injury, is the result of increased background checks caused by the challenged rule.

Defendants move to dismiss on essentially two grounds. First, they argue that Florida's tax related injuries are "too attenuated," Doc. 15 at 13, and "speculative," Doc. 15 at 17 (quotation omitted). Second, they argue that any injuries to Florida as a result of increased background checks are "voluntary and self-inflicted." Doc. 15 at 20; *see also* Doc. 15 at 25 (making the same argument with respect to Florida's sovereign injuries).

## LEGAL STANDARD

When deciding a motion to dismiss, a court must take all "factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). To establish Article III standing, Florida must show: (1) "an injury in fact;" (2) "that is fairly traceable to the challenged conduct of the defendant;" and (3) "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At this stage, "general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Bischoff v. Osceola Cty., Florida*, 222 F.3d 874, 878 (11th Cir. 2000).

## ARGUMENT

**I.   Florida has standing because the challenged rule imposes on Florida an ongoing, direct economic injury due to lost tax revenue.**

The State's injury—past and current loss of tax revenue from the challenged rule's increased regulation of firearms sales at gun shows—meets each of the three standing requirements. Defendants argue that the State's pocketbook injury is "too attenuated," Doc. 15 at 13, and "speculative," Doc. 15 at 17 (quotation omitted). Defendants are wrong.

   a.   *The State's lost tax revenue is an injury in fact.*

The State's lost tax revenue qualifies as an injury in fact. First, monetary harms are an "obvious" harm that "readily qualify as [a] 'concrete injur[y]' under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *Collins v. Yellen*, 594 U.S. 220,

243 (2021) (explaining that a pocketbook injury is "a prototypical form of injury in fact"). And state plaintiffs may rely on economic harms at least to the same degree as private plaintiffs. *See, e.g.*, *Chiles v. Thornburgh*, 865 F.2d 1197, 1208 (11th Cir. 1989) ("A state has standing to sue in its sovereign capacity when it has suffered an economic injury."); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) (finding standing based on an "adverse[] impact" on the States' "environment and economy"); *West Virginia v. U.S. Dept. of Treasury*, 59 F.4th 1124, 1136–37 (11th Cir. 2023) (recognizing that "States are not normal litigants for purposes of invoking federal jurisdiction" and recognizing States' interest in the operation of their duly enacted tax systems (quotations omitted)).

Second, there is no categorical rule that lost tax revenue is not an Article III injury. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (finding a State has standing based on a "a direct injury in the form of a loss of specific tax revenues"); *see also Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197 (2017) (finding prudential standing based on the allegation that "predatory practices" "diminish[ed] the City's property-tax revenue and increas[ed] demand for municipal services"). In fact, the federal government previously made (and lost) that precise argument in this division. *See Florida v. Becerra*, 544 F. Supp. 3d 1241, 1253 (M.D. Fla. 2021) (Merryday, J.). In *Becerra*, the United States contended that "loss of general tax revenue . . . creates no basis for standing" because such injury is not "concrete and imminent" and relies on "mere conjecture." *Id.* at 1253 (quotations omitted). The court, however, surveyed the relevant Supreme Court and Eleventh Circuit case law and concluded that "Florida

5

allege[d] a cognizable injury owing to lost tax revenue." *Id.* And importantly, the applicable tax in that case—as here—included "sales tax revenue." *Id.*

Third, Florida's allegations regarding declining gun show attendance are specific and plausible rather than general and speculative. *See Speaker v. HHS*, 623 F.3d 1371, 1380 (11th Cir. 2010) (Courts "[do] not require heightened fact pleading . . . but only enough facts to state a claim to relief that is plausible on its face." (quotations omitted)). Florida specifically alleges that attendance at gun shows has "decreased precipitously" and that, in some parts of the State, that decline has been as high as "50 percent" since the challenged rule went into effect on May 20. Doc. 13 ¶ 57. These are specific allegations the Court must accept as true rather than speculative conclusions.

At least one court has found that it is "not speculative" to say that the challenged rule "reduc[es] total attendance and sales at gun shows." *Texas v. ATF*, No. 24-cv-89, 2024 WL 2967340, at *5 (N.D. Tex. June 11, 2024). And the courts that have disagreed have done so at the preliminary injunction or temporary restraining order stage, where the movants were required to provide specific evidence of this effect, which was particularly difficult given that the rule had not yet gone into effect. *See, e.g.*, *Kansas v. Garland*, No. 24-cv-1086, 2024 WL 3360533, at 4* (D. Kan. July 10, 2024) ("Many or all of Plaintiffs might be able to establish that they have standing to pursue their claims. But they have not established that they are entitled to *extraordinary relief* . . . ." (emphasis added)). Notably, the evidentiary standard for purposes of preliminary relief is akin to the standard at summary judgment rather than the more permissive pleading standard. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015);

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 368 (7th Cir. 2020).

Finally, it is strange that Defendants find these allegations speculative given that ATF *predicted* these effects. Specifically, ATF foresaw that the challenged rule would push about "ten percent" of sellers out of the market who "are likely to be either unwilling or unable to become licensed . . . *as a result of the rule*." 89 Fed. Reg. at 29,054 (emphasis added).

For these reasons, Florida's tax related injury qualifies as an injury in fact.

      b.  *The State's lost tax revenue is fairly traceable to the challenged rule and a favorable judicial decision will redress the State's harm.*

Florida's lost tax revenue theory similarly satisfies the causation and redressability requirements. Causation requires showing a "causal connection between the injury and the conduct complained of." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Redressability requires it be "likely, as opposed to merely speculative, that the injury will be dressed by a favorable decision." *Id.* at 561 (quotations omitted). Courts often consider these two requirements together as "two sides of a causation coin." *Florida v. United States*, 660 F. Supp. 3d 1239, 1266 (N.D. Fla. 2023) (quoting *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997)). And even indirect injuries can meet these requirements. *See Lujan*, 504 U.S. at 562.

Causation and redressability are met here because, according to Florida's amended complaint, it is the challenged rule that is causing lower attendance at gun

7

shows and the resulting loss in sales tax revenue. Doc. 13 ¶¶ 51–57. And as a result, an injunction preventing the challenged rule from being enforced in Florida would fix the problem.

As discussed in the injury in fact section, there is no categorical rule that lost tax revenue is not a basis for state standing. *See Wyoming*, 502 U.S. at 448; *City of Miami*, 581 U.S. at 197; *Becerra*, 544 F. Supp. 3d at 1253. In arguing otherwise, Defendants rely principally on the Supreme Court's decision in *Florida v. Mellon*, 273 U.S. 12, 18 (1927), *see* Doc. 15 at 14. *Mellon*, however, involved several layers of speculation. Specifically, Florida argued there that certain federal actions might cause Florida citizens to "withdraw . . . property from the state" and that this withdrawal might result in "the consequent loss to the state of subjects of taxation." *Mellon*, 273 U.S. at 16–17. The Court found that "anticipated result" to be "purely speculative, and, at most, only remote and indirect." *Id.* at 18.

Courts have distinguished cases like *Mellon*, however, when a State alleges "a direct injury in the form of a loss of specific tax revenues." *Wyoming*, 502 U.S. at 448; *accord Texas v. United States*, 86 F. Supp. 3d 591, 622–23 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided* court, 579 U.S. 547, 548 (2016). *Florida v. Becerra* is instructive. There, Florida alleged that the CDC's shutdown of Florida's cruise industry cost the State tax revenue. *See Becerra*, 544 F. Supp. 3d at 1253. In accepting that theory, the court noted that Florida's "lost tax revenue [is] directly attributable to the cruise industry's closing." *Id.* The Supreme Court took a

similar approach in *City of Miami*, 581 U.S. at 197. There, the Court accepted the City of Miami's theory of standing, which was that certain banking practices diminished home values in Miami, and that this reduction thereby reduced property tax revenue for the city. *Id.* at 195, 197. Although that case addressed prudential standing rather than Article III standing, the Court treated the former as at least as difficult to satisfy as the latter. *Id.* at 197–98.

Florida's theory here is at least as direct as those cases. Florida's theory is based on a 6 percent sales tax that the State collects on admission to gun shows. Doc. 13 ¶¶ 54–57. It is not speculative or remote to expect a loss in revenue from the challenged rule because the *entire point* of the challenged rule is to prevent unlicensed gun sales at gun shows, which were previously treated as lawful. In fact, the federal government has characterized gun shows as a "critical gap in the background check laws" that the challenged rule seeks to fill. Doc. 13 ¶ 12 & n.5. And the challenged rule, including the preamble, uses the term "gun show" 129 separate times. *See* 89 Fed. Reg. at 28,968–29,093. Moreover, Florida's allegations with respect to these losses are specific and based on actual observations since the rule went into effect. *See* Doc. 13 ¶¶ 54–57 (discussing a 50 percent reduction in gun show attendance). And it is hardly speculative that the challenged rule would suppress the gun show market given that ATF expected the challenged rule to push about "ten percent" of sellers out of the market who "are likely to be either unwilling or unable to become licensed . . . *as a result of the rule*." 89 Fed. Reg. at 29,054 (emphasis added).

To be sure, standing is "more difficult to establish" when it is based on the actions of third parties not before the Court, such as the gun show attendees at issue here. *See Lujan*, 504 U.S. at 562 (quotations omitted). But the question in such cases is whether the standing theory "relies . . . on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). As explained above, this case fits that bill.

Finally, the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), does not alter these conclusions. That case considered economic effects that were several steps removed from the relevant regulation and not supported by record evidence. *Id.* at 391 (explaining that "[t]he chain of causation is simply too attenuated); *id.* at 390 (discussing a "lack[] [of] record support"). And the Supreme Court recognized that "downstream or upstream economic injuries to others in the chain" as a result of changed regulations continue to provide a basis for standing. *Id.* at 384. Here, Florida alleges specific facts demonstrating Defendants' efforts to suppress the gun show market and the predictable effect that has on tax revenue related to those gun shows. *See* Doc. 13 ¶¶ 54–57. Those allegations are sufficient to establish causation and redressability.

**II.     Florida's various injuries related to increased background checks also satisfy Article III.**

Florida alleges two standing theories related to the increase in background checks—(1) an increased burden on its background check system resulting in a drain on state resources and the frustration of state priorities, and, relatedly, (2) sovereign

injury in the form of interference with the State's duly enacted plans and a resulting pressure to change state law. Doc. 13 ¶¶ 58–76. Defendants do not appear to contest these effects.[2] Doc. 13 ¶ 66 (quoting the challenged rule, which states that "[t]he amended regulations will increase the number of background checks performed because more dealers will become licensed and run background checks on their customers"); Doc. 13 ¶ 16 (quoting the challenged rule, which acknowledges that States like Florida, which "do not rely on Federal law enforcement for their background checks," "may be affected by this rule to the extent they have to conduct increased background checks").

Nor can Defendants contest that these injuries would qualify under Article III. "States are not normal litigants for purposes of invoking federal jurisdiction." *West Virginia*, 59 F.4th at 1136–37. As such, a State suffers Article III injury when a federal policy forces it to expend resources. *See Chiles*, 865 F.2d at 1208–09. Similarly, a State suffers Article III injury from "compliance costs in meeting the regulatory burdens imposed by [a new] rule." *Alabama v. Sec'y of Educ.*, No. 24-1244, 2024 WL 3981994, at *6 (11th Cir. Aug. 22, 2024). And a State suffers Article III injury when it cannot "enforce the will of its legislature" or "further the [policy] considerations undergirding

---

[2] Defendants suggest that "any resulting increase in background checks is fairly traceable to the statute . . . rather than the Rule." Doc. 15 at 20. But that is not relevant to the pending motion, which is perhaps why Defendants only allude to this point in passing. At this stage of the litigation, the Court must accept the validity of Florida's legal theory. *See Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) (When reviewing standing, courts must "assume that on the merits the plaintiff[] would be successful in [its] claims." (quotations omitted)). And Florida's legal theory is that the challenged rule exceeds Defendants' legal authority because it goes far beyond the plain text of the statute. *See* Doc. 13 ¶ 14.

11

the law." *Doe v. Surgeon General, State of Fla.*, No. 24-11996, slip op. at 8 (11th Cir. Aug. 26, 2024) (quoting *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421 (6th Cir. 2024)) . As discussed, Florida asserts all three types of injury.

Given all this, Defendants advance one single argument against these standing theories—that Florida's injuries are "self-inflicted." Doc. 15 at 20. But that is wrong.

The entire premise of the sovereign injury doctrine is that, in our federal system, the States have their own "sovereign prerogatives." *West Virginia*, 59 F.4th at 1135. Those prerogatives include the ability to make their own policy judgments, and thus "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Consistent with that, courts have recognized that "pressure to change state law" is a form of Article III injury. *Texas v. United States*, 809 F.3d 134, 153 (2015). And while "injury to state sovereignty is, to be sure, intangible[,] it is nonetheless concrete." *West Virginia*, 59 F.4th at 1136.

Defendants' argument fundamentally resists that premise. They argue that, in order to avoid the complained of injuries, the State should simply amend its statute, abandon its plan to run the background check process at the state level, and select an entirely different state policy. *See* Doc. 15 at 20; § 790.065, Fla. Stat. But if that theory were sufficient to negate Florida's standing, the sovereign injury doctrine would not exist. After all, a State can always change its duly enacted plans if it wishes to avoid further inference with them.

That a State has duly enacted plans and polices does not render all injuries interfering with those plans voluntary. To be sure, in some cases, a State's claimed

12

injuries may be self-inflicted. For example, in *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976), Pennsylvania's theory of injury was that another State's tax took revenue from Pennsylvania because Pennsylvania law provided a tax credit for income tax its citizens paid to other States. But "it was Pennsylvania's own tax law that caused it financial harm. It did not suffer an affirmative harm imposed upon it by another sovereign's failure." *California v. ATF*, No. 20-cv-6761, 2023 WL 1873087, at *9 (N.D. Cal. Feb. 9, 2023). Here, by contrast, Florida's injury is that it must do *more* background checks and expend *more* resources as a direct result of ATF's unlawful rule. It does not claim injury based purely on its decision to conduct background checks but based on Defendants' unlawful decision to increase the burden of doing so. *See Wyoming*, 502 U.S. at 448 (holding that Wyoming had standing to challenge an Oklahoma statute that caused Wyoming to lose severance-tax revenue); *see also Alabama*, 424 F.3d at 1130 (distinguishing *Pennsylvania* and holding that States had standing because they "do not seek relief from each other or from harm caused by another State; rather, each has a different view of how the [federal government] should fulfill its obligations under both federal law and the agreements it has entered . . . .").

In fact, if Defendants were correct, the countless judicial victories Florida has obtained against the federal government were wrongly decided. On their view, the State suffered no cognizable injury because it could have simply changed state policy on vaccine mandates, *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021) (Merryday, J.), changed state policy with respect to protecting women's sports and locker rooms, *Alabama*, 2024 WL 3981994, at *6, changed state policy with respect to

13

irreversible surgeries for minors, *Florida v. HHS*, No. 8:24-cv-1080, 2024 WL 3537510, at *5 (M.D. Fla. Jul. 3, 2024) (Jung, J.), and changed state policy with respect to free public education, *Florida*, 660 F. Supp. 3d at 1266. Florida's injury here is no more self-inflicted than in those cases.

For all these reasons, Florida has standing based on the increased background checks caused by Defendants' unlawful rule.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to dismiss.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

*/s/ Christine K. Pratt*
Christine K. Pratt (FBN 100351)
COUNSELOR TO THE ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I certify that on September 9, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Christine Pratt*
Counselor to the Attorney General
