# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

               Plaintiff,

        v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, *et al.*,

            Defendants.

Case No. 8:24-cv-1041-CEH-NHA

---

**MOVANT STATES' OPPOSED MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION TO INTERVENE AS DEFENDANTS**

---

# **TABLE OF CONTENTS**

**Page**

STATES' MOTION TO INTERVENE AS DEFENDANTS ........................................ 1

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 3

ARGUMENT .............................................................................................................. 7

   I.    MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT ............................................................................................................. 7

       A. Movant States Have Substantial Interests In Upholding The Final Rule ........................................................................................ 7

       B. Existing Parties Will No Longer Adequately Represent Movant States' Interests, And Movant States Timely Intervened In Light Of That Change ................................................................................ 19

  II.   ALTERNATIVELY, PERMISSIVE INTERVENTION IS APPROPRIATE ................................................................................................... 25

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
    573 U.S. 169 (2014) ................................................................ 4, 11

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982)................................................................ 14, 15

*Berger v. N.C. State Conf. of the NAACP*,
    597 U.S. 179 (2022) ................................................................ 9, 19

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ................................................................... 13

*California v. Texas*,
    593 U.S. 659 (2021)...................................................................... 22

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022)..................................................................... 23

*Castillo v. Cameron Cnty., Tex.*,
    238 F.3d 339 (5th Cir. 2001)........................................................ 15

*Chiles v. Thornburgh*,
    865 F.2d 1197 (11th Cir. 1989)...........................................8, 9, 19, 24, 25

*Clark v. Putnam Cnty.*,
    168 F.3d 458 (11th Cir. 1999) .............................................21, 22, 24

*Cook Cnty. v. Texas*,
    37 F.4th 1335 (7th Cir. 2022) ....................................................24, 25

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
    640 F. Supp. 3d 59 (D.D.C. 2022) ................................................... 9

*Diaz v. S. Drilling Corp.*,
    427 F.2d 1118 (5th Cir. 1970) ......................................................... 8

*Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*,
   983 F.2d 211 (11th Cir. 1993) ................................................................ 21

*Georgia v. U.S. Army Corps of Eng'rs*,
   302 F.3d 1242 (11th Cir. 2002) ............................................................. 22

*GreenFirst Forest Prods. Inc. v. United States*,
   577 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ....................................... 9

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ............................................................................... 15

*Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*,
   254 F. App'x 769 (11th Cir. 2007) ........................................................ 24

*Howard v. McLucas*,
   782 F.2d 956 (11th Cir. 1986) .............................................................. 12

*Huddleston v. United States*,
   415 U.S. 814 (1974) ............................................................................. 3, 4

*Huisha-Huisha v. Mayorkas*,
   No. 22-5325, 2022 WL 19653946 (D.C. Cir. Dec. 16, 2022) ............. 24

*Kane Cnty. v. United States*,
   928 F.3d 877 (10th Cir. 2019) ............................................................... 23

*La Union del Pueblo Entero v. Abbott*,
   29 F.4th 299 (5th Cir. 2022) ................................................................... 7

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*,
   66 F.4th 282 (D.C. Cir. 2023) ............................................................... 22

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................... 15

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ............................................................................... 15

*Melone v. Coit*,
   100 F.4th 21 (1st Cir. 2024) ................................................................... 9

1

*Missouri v. Illinois,*
  180 U.S. 208 (1901) ........................................................................ 14

*Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.,*
  425 F.3d 1308 (11th Cir.2005) .......................................................... 8

*Nat'l People's Action v. Village of Wilmette,*
  914 F.2d 1008 (7th Cir. 1990) ......................................................... 15

*Oklahoma v. Castro-Huerta,*
  597 U.S. 629 (2022) ....................................................................... 15

*Pasqua Yaqui Tribe v. EPA,*
  No. 20-2266, 2021 WL 25776939 (D. Ariz. May 5, 2021) ................... 23

*Stansell v. Revolutionary Armed Forces of Colombia,*
  45 F.4th 1340 (11th Cir. 2022) ......................................................... 7

*Texas v. United States,*
  805 F.3d 653 (5th Cir. 2015) ........................................................... 12

*Thomas v. Henderson,*
  297 F. Supp. 2d 1311 (S.D. Ala. 2003) .............................................. 7

*Trbovich v. United Mine Workers of Am.,*
  404 U.S. 528 (1972) ....................................................................... 19

*United States v. Jefferson Cnty.,*
  720 F.2d 1511 (11th Cir. 1983) ........................................................ 22

*Va. House of Delegates v. Bethune-Hill,*
  587 U.S. 658 (2019) ......................................................................... 9

*Wal-Mart Stores, Inc. v. Texas Alcoh. Bev. Comm'n,*
  834 F.3d 562 (5th Cir. 2016) ........................................................... 23

*Worlds v. Dep't of Health & Rehab. Servs., State of Fla.,*
  929 F.2d 591 (11th Cir. 1991) ........................................................... 8

**Statutes**

18 U.S.C. § 921 ..................................................................................... 5

1

18 U.S.C. § 922 .................................................................................................4, 5

18 U.S.C. § 923 ....................................................................................................4

Ariz. Rev. Stat. Ann. § 44-7852 ......................................................................18

Ariz. Rev. Stat. Ann. § 13-3109 .......................................................................18

Ariz. Rev. Stat. Ann. §13-3118 ........................................................................18

Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022) ....................................................................................................5

Colo. Rev. Stat. Ann. §§ 18-12-112 .................................................................17

Colo. Rev. Stat. Ann. § 18-12-501 ...................................................................17

Colo. Rev. Stat. Ann. § 24-33.5-424 ...............................................................17

Conn. Gen. Stat. §§ 29-36*l* ..............................................................................17

Crime Control Act § 901(a)(1), 82 Stat. .........................................................4

Del. Code Ann. tit. 11, § 1448A ........................................................................17

Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ...........................................................................................................5

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968) ........................3

N.J. Stat. Ann. § 2C:58-2, -3 ............................................................................17

## Other Authorities

Erin G. Andrade et al., *Firearm Laws and Illegal Firearm Flow Between U.S. States*, 88 J. TRAUMA ACUTE CARE SURG. 752 (2020)................17

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT (NFCTA): CRIME GUNS – VOLUME II (2023) .....................................................................16

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT (NFCTA): CRIME GUNS – VOLUME III (2023)..................................................16, 17, 18

FBI, 2022 NICS OPERATIONAL REPORT (2022) .......................................... 21

FBI, FEDERAL DENIALS 1998-2022 (2022).............................................. 21

Fed. R. Civ. P. 24....................................................................2, 3, 7, 8, 9, 25

Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) .......................................*passim*

Sari Horwitz, *Tens of Thousands with Outstanding Warrants Purged from Background Check Database for Gun Purchases,* WASH. POST (Nov. 22, 2017)................................................................. 21

Ellicott C. Matthay et al., *In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries*, 167 ANNALS INTERNAL MED. 837 (2017) ................................................. 16

Ellicott C. Matthay et al., *In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries* ................................. 17

Glenn Thrush, *A.T.F. Braces for a Likely Rollback of Its Gun-Control Efforts*, N.Y. TIMES (Dec. 14, 2024).................................... 20

Gram Slattery, *Trump pledges to 'roll back' Biden gun rules, fire ATF chief at NRA rally*, Reuters (May 20, 2024) ............................ 20

NRA, *President Donald J. Trump Speaks at 2024 NRA Presidential Forum in Harrisburg, PA*, YOUTUBE (Feb. 10, 2024) https://www.youtube.com/watch?v=v_RBnl1vIjs ........................... 20

Rule 24(a) .......................................................................................2, 7, 9

Rule 24(b) .......................................................................................25

1

**<u>STATES' MOTION TO INTERVENE AS DEFENDANTS</u>**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, Movants New Jersey, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Maryland, Attorney General Dana Nessel on behalf of the People of Michigan, Minnesota, Nevada, North Carolina, Oregon, Rhode Island, Vermont, and Washington (collectively, "Movant States"), hereby move to intervene as defendants to defend the Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Final Rule"). For the reasons stated in the Memorandum of Law below, the Court should grant Movant States' motion to intervene.

## **<u>INTRODUCTION</u>**

This case challenges a Final Rule that implements Congress's amendments to the Nation's firearms laws. Among other important changes, the Bipartisan Safer Communities Act expanded the category of firearm dealers who must go through a background-check process before they can sell firearms to a would-be customer, and who must retain records of those sales that federal, state, and local law enforcement can use to solve violent crimes and to go after straw purchasers and gun traffickers. Because federal defendants can no longer be counted on to defend the Final Rule, and because elimination of the Final Rule would impose significant harms on Movant States, these 15 Movant States now move to intervene. Putative intervenors should be allowed to participate when their participation would promote the greater justice and would not harm existing parties. Movant States satisfy that low bar.

1

The basis for intervention is straightforward. The challengers seek final relief that would prevent implementation of the Final Rule across the country, whether in the form of vacatur or an injunction. But that relief would work enormous harms to Movant States' interests, giving Movant States a right to intervene under Rule 24(a). Indeed, as federal defendants have explained, absent the Final Rule fewer firearms dealers would obtain a federal license and be subject to Congress's recordkeeping requirements. Those records are critical in better enabling the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to provide state and local law enforcement with evidentiary leads to solve violent crime, including to go after straw purchasers and illegal gun traffickers. Without those records, state and local law enforcement will have to expend additional financial and law enforcement resources to solve the same violent crimes or to engage in the same interstate gun trafficking investigations—and worse still, will be unable to solve many crimes, allowing some criminals to recidivate. Not only would the loss of the Final Rule harm Movant States' access to crime-solving information, it would also make it easier for potentially dangerous individuals to obtain firearms in the first place and for these individuals to do so without going through a background check. This profoundly harms Movant States' financial and quasi-sovereign interests—including the safety of their residents.

Given the harms that Movant States would incur from an adverse judgment in this case, their need to intervene is clear. Although federal defendants were previously defending their Final Rule, there is little doubt that will now change:

the President-Elect promised to rescind a series of ATF rulemakings during the
2024 presidential campaign, and called out this particular Final Rule explicitly.
Without intervention, then, Movant States have no party representing their
interests—and this Court would be deprived of any adequate defense of the Final
Rule on the merits. Additionally, this intervention is neither belated or premature:
this dispute remains ongoing and this Court has not issued final judgment; federal
defendants will only now cease their defense of the Final Rule; and Movant States
are prepared to litigate in each case challenging this Final Rule. This Court should
allow them to intervene here and provide that defense.

## BACKGROUND

Seeking to aid federal, state, and local law enforcement in "their fight against
crime and violence," Gun Control Act of 1968 ("GCA"), Pub. L. No. 90-618, § 101,
82 Stat. 1213, 1213 (1968), Congress originally enacted the GCA to address the
significant role that interstate gun trafficking plays in contributing to "lawlessness
and violent crime in the United States." *Huddleston v. United States*, 415 U.S. 814,
824 (1974). The GCA reflects the judgment that there was a "serious problem of
individuals going across State lines to procure firearms which they could not
lawfully obtain or possess in their own State," S. Rep. No. 89-1866 at 19 (1966),
and that absent federal restrictions on firearms trafficking, state and local law
enforcement would not be able "to control this traffic within their own borders
through the exercise of their police power." Crime Control Act § 901(a)(1), 82 Stat.
at 225 (1968). The "principal" means by which Congress decided to deter and

facilitate the investigation of interstate gun trafficking was to establish baseline requirements for federally licensed firearms dealers. *See Huddleston*, 415 U.S. at 824 (noting Congress made "the principal agent of federal enforcement . . . the dealer").

Federal law thus requires that all those "engaged in the business" of selling firearms obtain a federal firearms license, and sets forth a number of basic safety measures all FFLs must follow. Among other things, to keep firearms out of the hands of persons who would use them unlawfully, federal law prohibits FFLs from transferring firearms to felons, individuals with domestic violence restraining orders, or those with outstanding arrest warrants. *See* 18 U.S.C. § 922(d). To ensure that FFLs in fact do not sell to such individuals, federal law requires FFLs to engage in background checks via the National Instant Criminal Background Check System ("NICS") before transferring firearms. *See* 18 U.S.C. § 922(t); *Abramski v. United States*, 573 U.S. 169, 172-73, 181 (2014). But Congress recognized that some firearms sold would still be used in crime, and thus federal law also requires licensees to maintain records of their firearms sales, and allows for the use of those records in a criminal investigation—including a trafficking investigation. *See* 18 U.S.C. § 923(g); *Abramski*, 573 U.S. at 173 (noting the GCA ensures "that the dealer keep certain records, to enable federal authorities both to enforce the law's verification measures and to trace firearms used in crimes").

Over five decades later, Congress recognized that a number of loopholes had undermined the efficacy of these longstanding anti-trafficking laws and resolved

to close them. *See* Bipartisan Safer Communities Act ("BSCA"), Pub. L. No. 117-159, 136 Stat. 1313 (2022). Prior to the BSCA, significant loopholes allowed unlicensed dealers to bypass the GCA's requirements altogether, and sell firearms without running purchasers via NICS or maintaining records of sales. Congress therefore decided to expand the number of dealers who need to become FFLs and be subject to these background-check and recordkeeping requirements by broadening the GCA's definition of entities "engaged in the business" of dealing firearms. 18 U.S.C. § 922(a)(1)(A). In place of a test requiring persons to be licensed only when they had "the principal objective of livelihood and profit," Firearms Owners' Protection Act, Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986), the BCSA defines "engaged in the business" to mean any "person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). A person seeks "to predominantly earn a profit" if "the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(22).

In light of that important statutory change, ATF proposed updating its regulations to reflect the new definition and to provide guidance—in light of the BCSA and prior court decisions—as to what conduct qualifies. Twenty States—including Movant States—filed a comment letter that supported ATF's proposed rule because (1) the expansion of basic federal background-check requirements

would "reduc[e] the number of guns transferred to prohibited persons" by "curtail[ing] the opportunities" for prohibited persons to avoid NICS, and (2) the rule assists state and local "law enforcement by ensuring that accurate and adequate records are kept for more transactions, providing them with the information they need to effectively inspect gun dealers, trace crime guns, prosecute gun charges, and help keep the communities they serve safe." Ex. 3 at 3 (Multistate Comment on Proposed Rule (Dec. 7, 2023)).

On April 19, 2024, ATF then published the Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Final Rule"). The Final Rule implements the BSCA's expanded definition of "engaged in the business," and it clarifies in greater detail how that statutory definition applies to firearm dealers. ATF estimates that anywhere from 25,563 to 95,505 previously unlicensed individuals would now require federal licensees, and therefore would be subject to the various background check and recordkeeping requirements applicable to FFLs. *See id.* at 29,071-73. ATF found that the Final Rule will "help[] prevent firearms from being sold to felons or other prohibited persons, who may then use those firearms to commit crimes and acts of violence," *id.* at 29,085, and "help Federal, State, local, and Tribal law enforcement solve crimes involving firearms through crime gun tracing," *id.* at 29,988.

Plaintiffs filed this action on May 1, 2024, ECF 1. After Defendants moved to dismiss the Complaint, ECF 11, Florida filed the First Amended Complaint, ECF 13, which Defendants also moved to dismiss, ECF 15. Briefing on that motion is

still ongoing, *see* ECF 20, and no discovery has been exchanged. The Court has not

yet heard argument or issued a decision on the motion.

### ARGUMENT

## I.   MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT.

Under Rule 24(a), a movant has a right to intervene where it "has an interest

relating to. . . the subject of the action" and the outcome of the lawsuit might

"impair or impede [their] ability to protect that interest"; the existing parties

cannot or will not adequately represent movant's interest; and the motion is timely.

*Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1362 (11th

Cir. 2022); *see also La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 305 (5th

Cir. 2022) (same). "Rule 24 is construed liberally," so courts resolve all doubts "in

favor of the proposed intervenor." *Thomas v. Henderson*, 297 F. Supp. 2d 1311,

1326 (S.D. Ala. 2003). Each consideration compels granting Movant States a right

to intervene: this suit threatens to impair Movant States' substantial pocketbook

and quasi-sovereign interests; federal defendants no longer adequately represent

those interests; and Movant States' motion is swift and timely.

### A.   Movant States Have Substantial Interests In Upholding The Final Rule.

The Eleventh Circuit has required an intervenor to have a "direct,

substantial, legally protectable interest in the proceedings." *Worlds v. Dep't of

Health & Rehab. Servs., State of Fla.*, 929 F.2d 591, 594 (11th Cir. 1991) (quoting

*Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970)); *see also* Fed. R. Civ.

Pro. 24(a)(2) (asking whether the putative intervenor has "an interest relating to the property or transaction that is the subject of the action"). Although intervention is unwarranted when putative intervenors have mere economic interests, *Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*, 425 F.3d 1308, 1311 (11th Cir.2005), the interests test is not otherwise a high bar. While the *objective* of Movant States may be the same as the prior administration, the *interests* are not the same, and there is a substantial risk that those *interests* would not be protected in the Movant States were denied intervention. *Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989). Such interests can sometimes include financial or property interests, *Diaz*, 427 F.2d at 1124, or they can be non-property interests that are "concrete and particularized. *Chiles*, 865 F.2d. at 1210. And the Eleventh Circuit has emphasized that it will assess the interest requirement with flexibility, evaluating "the particular facts and circumstances surrounding each [motion for intervention]." *Id.* at 1214. Movant States have a right to intervene here because invalidation of the Final Rule would harm Movant States' interests in two ways: (1) it would reduce the availability of records on which state and local law enforcement consistently rely to solve crimes, and (2) it would increase prohibited persons' access to and use of guns in crime in Movant States.[1]

---

[1] Beyond establishing sufficient interests to justify their Rule 24(a) intervention, Movant States do not also need to independently establish their Article III standing to intervene as defendants in this Court. As the Supreme Court has held, there is no need to establish standing where Movant States ask only that this Court reject Plaintiffs' claims. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (defendant-intervenor need not establish Article III standing since

1. Movant States have overwhelming "interest[s] in the resolution of this lawsuit that may be practically impaired or impeded without their participation." *Berger*, 597 U.S. at 191; *see also*, *e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 640 F. Supp. 3d 59, 68 (D.D.C. 2022) ("Constitutional standing sufficiently demonstrates . . . interest" under Rule 24(a)). Invalidation of the Final Rule will make it more difficult for Movant States to solve gun crimes, thus imposing direct and substantial financial and quasi-sovereign burdens on Movant States, Movant States have a protectable interest in defending the Final Rule.

Initially, because the invalidation of the Final Rule would reduce the number of entities that maintain firearms transaction records by anywhere from 25,563 to 95,505 dealers. 89 Fed. Reg. at 29,071-73. Thus, invalidation will make it harder for Movant States to solve crimes involving firearms. Whenever state or local law enforcement recovers a firearm that was used in a crime, that firearm can provide

---

its defense of redistricting plan did not "entail[] invoking a court's jurisdiction"); *see also Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179 (2022) (confirming legislative leaders may intervene to defend law without discussing standing); *Melone v. Coit*, 100 F.4th 21, 28-29 (1st Cir. 2024) (rejecting argument that intervenor defendant has "to establish independent Article III standing" if it "simply seeks to defend the agency's position"); *GreenFirst Forest Prods. Inc. v. United States*, 577 F. Supp. 3d 1349, 1354 n.4 (Ct. Int'l Trade 2022) (same). That makes sense: only a party who invokes a court's jurisdiction has to prove standing, and a party does not affirmatively "invok[e] a court's jurisdiction" by defending a suit. *Bethune-Hill*, 587 U.S. at 663. To the extent prior Eleventh Circuit decisions required putative defendant-intervenors to establish standing, those decisions are inconsistent with the Supreme Court's decision in *Bethune-Hill*, which makes clear that a court should not require prospective defendant-intervenors who assert no counterclaims to establish standing. *Id.*; *accord Chiles*, 865 F.2d at 1213 (rejecting argument that courts in the Eleventh Circuit must ensure intervenors have standing "as long as there exists a justiciable case and controversy between the parties already in the lawsuit"). Movant States would need to establish standing to assert a cross-appeal or file an appeal, *see Melone*, 100 F.4th at 28-29, but have taken no such actions here. In any event, even if Movant States must establish Article III standing, they can do so for the same reasons their interests would be harmed by a court order invalidating the Final Rule.

important evidence as to the identity of the perpetrator, or help to identify gun trafficking networks. *See* Ex. 1 at 3-8. Where law enforcement can identify the manufacturer and serial number of the firearm, which are evident on the gun, they can submit that information to ATF so that ATF can identify at least some of the previous retailers and purchasers of the weapon. *Id.* at 3-4; Ex. 2 at 3; *see also* 89 Fed. Reg. at 29,083 (noting "crime-gun tracing is one of the most valuable and effective services ATF provides to law enforcement agencies. . . in investigating crimes involving firearms"); *id.* (adding that in FY2022, "the Department performed over 623,000 crime-gun traces. Of these, 27,156 were deemed 'urgent,' which included firearms used in criminal activities such as mass shootings, homicides, bank robberies, and other immediate threats to officer and public safety").

The ease with which ATF can track the crime gun to prior purchasers and identify persons who may be the perpetrator of the crime, or involved as a straw-purchaser or member of an illegal firearms trafficking network, depends on whether the retailers involved were licensed and subject to GCA recordkeeping requirements. As the Final Rule explains, "[w]hen a firearm is recovered in a criminal investigation and submitted for tracing, ATF is often able to identify the last known purchaser through records maintained by the licensee, providing crucial leads in the underlying criminal investigation. When a firearm is transferred by an unlicensed person, however, such records rarely exist and, if such records do exist, they are not accessible to ATF through the tracing system." 89

Fed. Reg. at 29,083; *see also id.* at 28,988 (noting "[u]nder the GCA, 'dealers must store, and law enforcement officers may obtain, information about a gun buyer's identity. That information helps to fight serious crime. When police officers retrieve a gun at a crime scene, they can trace it to the buyer and consider him as a suspect'" (quoting *Abramski*, 573 U.S. at 182)); *id.* at 29,083 (ATF can "determine the purchaser in 77 percent" of law enforcement's trace requests "[l]argely as a result of the records the GCA requires licensees to maintain"); *see also* Ex. 1 at 3-4 (N.J. declaration discussing experience with ATF tracing system); Ex. 2 at 2-4 (A.Z. declaration explaining same).

A court order invalidating the Final Rule, especially one with nationwide effect, would make it more difficult for ATF to provide helpful leads to state and local law enforcement that they could use in solving crime. ATF has recognized that the Final Rule would "increase licensure of those engaged in the business of dealing in firearms, and correspondingly increase the availability of GCA-required records from those newly licensed dealers"—and thus "enhance the capacity of the Department to successfully complete crime-gun traces for law enforcement partners globally." 89 Fed. Reg. at 29,083; *see also id.* at 28,698, 28,988 (because the Final Rule will help "more persons become licensed" and ensure "the transaction records maintained by those dealers will allow law enforcement to trace more firearms involved in crime and to apprehend more violent offenders who misuse firearms," the Final Rule "will help Federal, State, local, and Tribal law enforcement solve crimes involving firearms through crime gun tracing"). The

converse follows: the invalidation of the Final Rule would *decrease* the "sellers who maintain firearms transaction records, submit multiple sales reports, report theft and losses of firearms, and respond to crime gun trace requests," *id.* at 29,063, undermine "ATF's capacity to complete crime-gun traces," and thus cut back on "the evidentiary leads ATF provides to law enforcement investigating crimes involving firearms, particularly violent offenses such as homicide, aggravated assault, armed robbery, and armed drug trafficking," *id.* at 29,083; *see* Ex. 1 at 4-5 (N.J. declaration detailing role of ATF information in provide leads to solve violent gun crimes).

That the Final Rule, by design, results in greater evidentiary leads to state law enforcement confirms that Movant States have a direct and substantial interest in its defense. For one, the States are important "intended beneficiaries" of the Final Rule and the GCA. *See Texas v. United States*, 805 F.3d 653, 658-69 (5th Cir. 2015) (emphasizing that intended beneficiaries of a federal policy have a sufficient interest supporting intervention as of right where that policy is challenged, and collecting cases); *Howard v. McLucas*, 782 F.2d 956, 958-59 (11th Cir. 1986) (finding an alleged interest sufficient where a consent decree adversely affected intervenors' eligibility for target promotions). In enacting the GCA, Congress found that its licensed dealer requirements—including its recordkeeping requirements—would aid state and local law enforcement in their fight against violent crime. *See supra* at 3. And the Final Rule repeatedly finds that the expansion of who must qualify as an FFL and the expansion of who must retain

purchaser records serves state and local law enforcement by improving ATF's capacity to generate evidentiary leads. *See, e.g.*, 89 Fed. Reg. at 28,988 (agreeing Final Rule "will help Federal, State, local, and Tribal law enforcement solve crimes involving firearms through crime gun tracing"); *see also id.* at 28,994 (highlighting the "crucial intelligence provided directly to law enforcement in their respective jurisdictions"); *id.* at 28,989 (same); *id.* at 29,063 (same); *id.* at 29,070 (same); *id.*at 29,083 (emphasizing Final Rule enhances ATF tracing function, which is "one of the most valuable and effective services ATF provides to law enforcement agencies"); *id.*at 29,083-85 (same). And that interest is substantial: asking ATF to trace a crime gun to generate leads, in order to identify suspects in a violent crime or to identify those who served as the perpetrator's straw purchaser or firearms trafficker, is a routine part of many state and local law enforcement investigations, and has repeatedly allowed law enforcement to solve crime—just as the GCA and Final Rule intend. *See* Ex. 1 at 3-4.

Movant States also have other, financial interests that will be impacted from a court order invalidating the Final Rule. *See Biden v. Nebraska*, 600 U.S. 477, 490 (2023) (emphasizing a State suffers an Article III injury—a higher burden than the showing Movant States must make—when the State would suffer a "financial harm"). The Final Rule explains that increasing the number of dealers that retain firearms records allows ATF to provide evidentiary leads to state and local law enforcement officers to "use this information to better target limited resources." 89 Fed. Reg. at 28,989. The experience of state law enforcement bears this out:

where trace records do not reveal a firearm's most recent purchaser, state officers must take additional investigative steps to identify the current owner. *See* Ex. 1 at 6-8. Those investigative steps can be burdensome—requiring law enforcement officers to conduct interviews and/or to cross state lines—demanding significant monetary and personnel resources. *See* Ex. 1 at 6 (explaining out-of-state travel, out-of-state interviews, out-of-state surveillance, and other investigative steps demand significant financial costs from state). Invalidation of the Final Rule and the concomitant loss of recordkeeping for a significant volume of firearms sales would thus directly increase state costs to solve violent crime and fight illegal trafficking.

Movant States also have related quasi-sovereign interests that support their defense of the Final Rule. *See*, *e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 603-04, 607 (1982) ("*Snapp*") (finding States have quasi-sovereign interests in the health and safety of their residents, and that where "the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them") (quoting *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)).[2] Few interests matter more to States than protecting their residents from violence. *See, e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 651

---

[2] Although Movant States acknowledge that "[a] State does not have standing as *parens patriae* to bring an action *against* the Federal Government" based upon these interests, *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (emphasis added) (quoting *Snapp*, 458 U.S. at 610, n.16 (in turn citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923))), the so-called "*Mellon* bar" is no obstacle to a State's assertion of standing to *defend* federal action based on its quasi-sovereign interests in the health and well-being of its residents. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007).

(2022) (noting the State's "strong sovereign interest in ensuring public safety and criminal justice within its territory" in the preemption context); *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 351 (5th Cir. 2001) (agreeing "State has a legitimate interest in 'protect[ing] its citizens from criminal elements.'" (quoting *Nat'l People's Action v. Village of Wilmette*, 914 F.2d 1008, 1011 (7th Cir. 1990))).

But when ATF is able to provide fewer evidentiary leads from a gun trace, it reduces the chance that state law enforcement can solve that crime—let alone find the gun traffickers or straw purchasers who facilitated the offense. *See* Ex. 1 at 4. If state law enforcement cannot trace the firearm to a criminal offender or straw purchaser because the straw purchaser evaded the GCA recordkeeping system by approaching an unlicensed dealer, that straw purchaser and criminal will more likely remain on the street and able to recidivate. *See* Ex. 1 at 8-9 (discussing dangers of recidivism); 89 Fed. Reg. at 29,083 (explaining "straw purchasers. . . are the lynchpin of most firearms trafficking operations" and that tracing data is "beneficial" to States in capturing them and thus "help[s] law enforcement reduce criminal activities"). That harms Movant States.

2. Movant States have a second protectable—and profound—interest in defending the Final Rule: elimination of the Final Rule will increase the tide of unlawful firearms within and into their borders, again imposing direct and substantial financial and quasi-sovereign harms.

Elimination of the Final Rule will increase the trafficking and use of unlawful firearms in Movant States by increasing the number of firearms sales that do not

involve background checks. Between 2017 and 2021, "the most frequent types of trafficking channels identified in ATF investigations were unlicensed firearm dealing"—at 40.7%. BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, NATIONAL FIREARMS COMMERCE AND TRAFFICKING ASSESSMENT (NFCTA): CRIME GUNS – VOLUME III, pt. 3, at 1–4 (2023) (hereinafter "NFCTA VOL. III"). Transactions in which the firearms purchaser does not undergo a background check have a shorter time-to-crime, suggesting the traced firearms "were rapidly diverted from lawful firearms commerce into criminal hands." NFCTA VOL. II, pt. 3, at 35; *see* 89 Fed. Reg. at 29,084 (describing how longer time-to-crime data indicates that having new licensees conduct purchaser background checks "will deter violent felons, traffickers, and other prohibited persons from obtaining firearms from those dealers").[3]

Elimination of the Final Rule will increase prohibited persons' access to firearms even in the States that maintain more stringent licensing requirements, given the nature of illegal interstate firearms trafficking.[4] Crime guns are rarely

---

[3] Studies estimate that extending licensure requirements to these dealers will decrease interstate trafficking of firearms into Movant States. *See* Brian Knight, *State Gun Policy & Cross-State Externalities: Evidence from Crime Gun Tracing*, 5 AM. ECON. J.: ECON. POL'Y 200, 224 (2013) (emphasizing regulations can "eliminate incentives for trafficking into this state"). Conversely, allowing traffickers to acquire firearms while avoiding background checks exposes Movant States to increased firearms trafficking. *See* Ex. 1 at 8.

[4] Movant States have little choice to intervene to defend the Final Rule, as they lack the powerful unilaterally to avoid these harms themselves. Even for Movant States that have adopted their own licensing requirements, given the above-discussed nature of interstate gun trafficking, a reduction in the scope of federally-mandated background checks across the country will have a direct impact on public safety within their borders. *See, e.g.*, Ellicott C. Matthay et al., *In-State and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries*, 167 ANNALS INTERNAL MED. 837, 842 (2017); Erin G. Andrade et al., *Firearm Laws and Illegal Firearm Flow Between U.S. States*, 88 J. TRAUMA ACUTE CARE SURG. 752, 758 (2020).

purchased at a firearms retailer just prior to their use in crime. Instead, many people who are prohibited from possessing a firearm turn to unlicensed dealers because they cannot pass a background check to legally purchase a gun from an FFL. These guns acquired by unlicensed dealing are frequently used in crimes, including shootings. NFCTA VOL. III pt. 4, at 5 (reporting 368 cases where a firearm acquired from an unlicensed dealer was recovered in a shooting). While some states do strictly regulate the transfer of firearms under state law to require background checks, crime guns can still flow in from states that have little to no regulation of firearms transfers. *See* NFCTA VOL. III, pt. 3, at 1–4, *see* Ex. 1 at 6-10 (discussing the majority of guns recovered from crime scenes originating in out of state).[5]

Conversely, for Movant States with little to no regulation of firearms transfers other than compliance with federal law, the Final Rule will help reduce the intrastate transfer of firearms to criminals. For example, Arizona law does not require background checks, permits, or the registration of firearms sold in private sales. *See, e.g.*, Ariz. Rev. Stat. Ann. §§ 44-7852, 13-3109(B), 13-3118. In other words, if a firearms sale in Arizona is not regulated by the GCA, it is not regulated at all. This makes it incredibly easy for criminals to purchase or obtain firearms

---

[5] This means that even states like New Jersey which passed state laws that require every in-state transfer to go through a state licensed dealer are powerless to resolve this issue on their own. *See* N.J. Stat. Ann. § 2C:58-2, -3; *see also* Colo. Rev. Stat. Ann. §§ 18-12-112(2)(a), 18-12-501(1)(a), 24-33.5-424(3)(a); Conn. Gen. Stat. §§ 29-36*l*(f)(2); Del. Code Ann. tit. 11, § 1448A(a). The nature of this problem demands a solution at the federal level.

from unlicensed dealers without documentation. According to ATF data, of the
39,771 crime guns recovered in Arizona between 2017 and 2021 and successfully
traced to a known purchaser, the purchaser and the person who used the gun in a
crime were the same individual in only 14% of cases.[6] Ex. 2 at 4. In Arizona in
particular, the trafficking of firearms presents an immense public safety risk. The
ATF Phoenix field division generated the highest percentage of trafficking
investigations involving unlicensed dealers (14.0% of 3,404 investigations) and
involving straw purchasers (14.1% of 3,305 investigations). NFCTA VOL. III, pt. 3,
at 4. The Final Rule with make it more difficult for criminals to access firearms in
Arizona, furthering the State's interest in public safety.

Movant States thus have substantial financial and quasi-sovereign interests
in defending a federal regulation that ensures more firearms transfer will involve
background checks. State law enforcement expends significant resources on
investigating and prosecuting prohibited persons in possession of firearms that
originate out of state that were acquired without background checks. *See* Ex. 1 at
6-8. Although the Final Rule would not eliminate all unlicensed dealing, requiring
tens of thousands of new licensees to conduct background checks lowers the costs
that the Movant States directly sustain related to crimes committed by prohibited
persons that would be rejected by a simple background check. *See* Ex. 1 at 8-10.

---

[6] Of the 39,771 crime guns recovered in Arizona and traced to a known purchaser, the vast majority
of those guns (32,771) were purchased within Arizona. Ex. 2 at 5. Meaning the majority of crime
guns recovered in Arizona were purchased in the state and later transferred without
documentation to someone else within the state.

Given the "possibility" that Movant States' interests in the expansion of recordkeeping and background checks enshrined in the Final Rule would be "impaired or impeded" by a court order in this case, *Berger*, 597 U.S. at 191, Movant States maintain a right to intervene so the court may consider their "legally protectable interest in the litigation" before making potentially adverse decisions. *Chiles*, 856 F.2d at 1212.

### B. Existing Parties Will No Longer Adequately Represent Movant States' Interests, And Movant States Timely Intervened In Light Of That Change.

This Court should allow Movant States to intervene to defend their interests because there are no longer parties adequately defending them, and because Movant States timely filed as soon as that representation become inadequate. As to the representation of Movant States' interests, they bear only a "minimal" burden at this step—to show that the representation by existing parties "*may* be inadequate.*" Chiles*, 865 F.2d. at 1214 (emphasis added) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Although federal defendants were defending this Final Rule, and protecting Movant States' interests in it, that will change after the January 20, 2025 inauguration. The President-Elect has promised to quickly reverse ATF rules adopted by the Biden Administration, even citing this Final Rule.[7] According to the President-Elect, such actions "will be

---

[7] *See, e.g.*, Gram Slattery, *Trump pledges to 'roll back' Biden gun rules, fire ATF chief at NRA rally*, Reuters (May 20, 2024), https://tinyurl.com/5n8asdf8.

terminated on my very first week back in office, perhaps my first day."[8]  And the President-Elect even focused on ending the Final Rule when he "pointed to [current ATF Director Steven M.] Dettelbach's effort to expand background checks on weapons sold at gun shows, to include private kitchen-table gun sales and online firearms marketplaces" for particular criticism.[9] Because federal defendants will now likely seek elimination of this Final Rule, they can no longer adequately defend Movant States' interests in its survival.

The decisions taken during the last Trump Administration—including policies that make it harder for law enforcement to track crime guns, and policies cabining the scope of federal background checks—confirm that federal defendants are unlikely to adequately represent Movant States' interests going forward. As to the former, less than a month into the President-Elect's first term in office, his Administration narrowed the availability of certain NICS records. Whenever a person purchases a firearm from an FFL, the FFL relays the buyer's information to the FBI through the NICS for verification that the buyer has no criminal record and is otherwise eligible to procure the firearm. *See* Ex. 1 at 5; Ex. 2 at 5; *see* FBI, 2022 NICS OPERATIONAL REPORT at 31 (2022) (more than 440 million checks have occurred since NICS launched in 1998); FBI, FEDERAL DENIALS 1998-2022 at 1 (2022) (preventing more than 2.3 million transfers to prohibited purchasers). The

---

[8] NRA, *President Donald J. Trump Speaks at 2024 NRA Presidential Forum in Harrisburg, PA*, YOUTUBE (Feb. 10, 2024) https://www.youtube.com/watch?v=v_RBnl1vIjs.

[9] Glenn Thrush, *A.T.F. Braces for a Likely Rollback of Its Gun-Control Efforts*, N.Y. TIMES (Dec. 14, 2024), https://tinyurl.com/j385b7dc.

first Trump Administration not only narrowed who qualified as a "fugitive from justice"—a term that statutorily renders an individual ineligible to purchase firearms—but also purged *all* fugitive records from the NICS database, even records which met the FBI's narrowed definition, removing those records as a tool for law enforcement investigations.[10] This previous conduct confirms the incoming Trump Administration does not share Movant States' interests in expanding the role of NICS and expanding the availability of such records for law enforcement, as the Final Rule does.

The Eleventh Circuit's presumption of adequate representation is inapplicable in this case. *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 215 (11th Cir. 1993). Although the Eleventh Circuit finds representation presumptively adequate if an existing party "pursues the same ultimate objective" as the putative intervenors, *id.*, this presumption is weak requiring only "some evidence to the contrary." *Clark v. Putnam Cnty.*, 168 F.3d 458, 461 (11th Cir. 1999). Representation by an Administration that in fact opposes the Final Rule undermines the notion that representation of Movant States' interests is adequate. *See id.* at 462 (finding that interests diverged where defendants' willingness to compromise with plaintiffs impeded their ability to represent the interests of intervenor-defendants). Federal defendants—despite "having started out as . . . all[ies]"—will be Movant States' "adversar[ies]," and not

---

[10] *See* Sari Horwitz, *Tens of Thousands with Outstanding Warrants Purged from Background Check Database for Gun Purchases*, Wash. Post (Nov. 22, 2017), https://tinyurl.com/4a7pakyv.

"faithful representative[s] of [Movant States'] interest." *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 66 F.4th 282 (D.C. Cir. 2023). Intervention provides the precise solution for this problem: to ensure this Court has parties who are willing and well-suited to defend the Final Rule, and thus to ensure appropriate adversarial presentation on the merits and equities questions implicated here. *California v. Texas*, 593 U.S. 659, 668 (2021) (noting that because the Trump Administration "took the side of the plaintiffs" in a challenge to the Affordable Care Act, the courts had allowed a group of States—including multiple Movant States—to "intervene[] in order to defend the Act's constitutionality").

Movant States' intervention is also timely—as they are filing promptly upon their interests no longer being adequately represented in this case. *See Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002) (emphasizing timeliness is not a strict standard and "must have accommodating flexibility"); *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1516 (11th Cir. 1983) (outlining factors for deciding the timeliness of intervention). Movant States are filing this motion as soon as doing so became necessary, and the denial of their motion would leave their interests unrepresented given the incoming change in federal Administration. By contrast, granting the motion would prejudice no party, and would instead ensure adversarial presentation.

Movant States have acted swiftly and diligently. When this litigation began, Movant States had no reason to intervene as their interest in defending the Final Rule was aligned with federal defendants' own. *See supra* at 19-22 (discussing

adequacy). But since that will change after Inauguration on January 20, 2025, *see supra* at 19-20, Movant States have swiftly filed their papers, so that there will be a seamless transition from one government's defense of the Final Rule (federal defendants) to other governments with interests in it (Movant States). "[T]he timeliness of [Movants States'] motion should be assessed in relation to that point in time," *i.e.*, when their "need to seek intervention. . . ar[o]se." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 280 (2022).

By contrast, granting Movant States' request to intervene would not prejudice the existing parties at all. By way of this intervention motion, Movant States do "not seek to delay or reconsider phases of the litigation that ha[s] already concluded." *Wal-Mart Stores, Inc. v. Texas Alcoh. Bev. Comm'n*, 834 F.3d 562, 565-66 (5th Cir. 2016). Instead, Movant States seek to continue defending the Final Rule after the anticipated abandonment by Defendants, including at the summary-judgment stage. *See Kane Cnty. v. United States*, 928 F.3d 877 (10th Cir. 2019) (approving of intervention following change in presidential administration); *Pasqua Yaqui Tribe v. EPA*, No. 20-2266, 2021 WL 25776939, at *1 (D. Ariz. May 5, 2021) (same). It is appropriate here: there has been no discovery to date, and motion to dismiss proceedings are ongoing, *see* ECF 20 (ordering further briefing).

23

*See Chiles*, 865 F.2d at 1213 (finding timeliness where motions were filed prior to discovery).[11]

The timeliness of this intervention motion contrasts sharply with the cases in which States' motions were denied as untimely. *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 254 F. App'x 769, 771 (11th Cir. 2007) (denial of intervention motion filed three years after the intervenors knew their interests would no longer be represented); *Huisha-Huisha v. Mayorkas*, No. 22-5325, 2022 WL 19653946, at *1-2 (D.C. Cir. Dec. 16, 2022) (not permitted to intervene in defense of federal policy when district court already vacated the policy and movants had been submitting filings in other courts for more than a year). Unlike those cases, there is no final decision here, President-Elect Trump has yet to take office, and up until this point, Movant States reasonably relied on federal defendants to represent their interests. *Cf. Cook Cnty. v. Texas*, 37 F.4th 1335, 1342 (7th Cir. 2022) ("States were justified in relying on DHS's continued defense of the . . . Rule at least through the November 2020 election"). This motion is timely, and would allow Movant States to provide a defense.[12]

---

[11] Nor is the possibility that Movant States will oppose a potential settlement between Plaintiffs and federal defendants prejudicial. *Clark*, 168 F.3d at 461-62 (granting intervention even where intervenors would be adverse to settlement).

[12] Just as Movant States have not brought this motion to intervene too late (for timeliness purposes), Movant States have also not filed too early (for adequacy purposes)—because they are not required to wait until the incoming Administration in fact terminates its defense of this Final Rule. For one, Movant States acted swiftly to avoid any risk that this Court would find their motion came too late. *Cf. Cook Cnty.*, 37 F.4th at 1342. For another, Movant States would likely have no formal advance notice from federal defendants that they are ceasing the defense of the Final Rule, and may learn of that development only when federal defendants and Plaintiffs settle. *Id.* Finally,

## II. ALTERNATIVELY, PERMISSIVE INTERVENTION IS APPROPRIATE.

Because Movant States satisfy the standard for mandatory intervention, this Court need not consider permissive intervention under Rule 24(b). But to the extent this Court reaches that issue, it should allow intervention under Rule 24(b). Such intervention is appropriate when the proposed intervenor can show: (1) the applicant "has a claim or defense that shares with the main action a common question of law or fact"; (2) the motion is timely; and (3) intervention will not delay or prejudice adjudication of the existing parties' rights. FRCP 24(b)(1)(B), (b)(3); *Chiles*, 865 F.2d. at *1213*. That is easily met here: Movant States motion is timely, *see supra* at 22-24; intervention will not delay or prejudice any party, *see supra* at 23; and common questions of law and fact exist since Movant States seek to defend the precise agency action that the challengers here attack (the Final Rule). Movant States also can provide briefing on the impact of any decision on other States, and they can brief the impact on this litigation of a future decision by the ATF to reverse course and decide to rescind the Final Rule. Because Movant States satisfy the standard for permissive intervention, and would provide useful briefing to the Court, this Court should exercise its discretion to grant the motion.

## <u>CONCLUSION</u>

This Court should grant Movant States' motion to intervene as defendants.

---

even though Movant States may be justified in waiting to ascertain what position federal defendants will take after the change in administration before intervening in other cases, federal defendants' forthcoming position in *this* case is clear. *See supra* at 19-22.

Dated: January 16, 2025                    Respectfully submitted,

                                           **MATTHEW J. PLATKIN**
                                           *Attorney General, State of New Jersey*
                                           JEREMY M. FEIGENBAUM*
                                           *Solicitor General, State of New Jersey*

                                           */s/ Bryce K. Hurst*

                                           BRYCE   K.   HURST  (NJ  Bar  No.
                                           336532021)**
                                           Deputy Attorney General
                                           New Jersey Attorney General's Office
                                           25 Market Street
                                           Trenton, New Jersey 08625
                                           (609) 696-4562
                                           Bryce.Hurst@law.njoag.gov
                                           **Special Admission Pending

                                           *Attorneys for State of New Jersey*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Emma H. Mark*

Hayleigh S. Crawford*
Deputy Solicitor General
Emma H. Mark*
Assistant Attorney General
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
Emma.Mark@azag.gov
ACL@azag.gov

*Attorneys for State of Arizona*

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ Shannon Stevenson*

Shannon Stevenson*
Solicitor General
Office of the Colorado State Attorney General
1300 Broadway, Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov

*Attorneys for State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ James M. Belforti*

James M. Belforti*
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06105
(860) 808-5450
james.belforti@ct.gov

*Attorneys for State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*

Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for State of Delaware*

27

**ANNE E. LOPEZ**
Attorney General of Hawai'i

By: */s/ Thomas J. Hughes*

Thomas J. Hughes*
Deputy Solicitor General
Department of the Attorney General,
State of Hawai'i
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
Thomas.J.Hughes@hawaii.gov

*Attorneys for State of Hawai'i*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Jessica M. Finberg*

Jessica M. Finberg*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6921
jfinberg@oag.state.md.us

*Attorneys for State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Adam R. de Bear*

Adam R. de Bear*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 335-7573
debeara@michigan.gov

*Attorneys for Attorney General
Dana Nessel on behalf of the
People of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Liz Kramer*

Liz Kramer*
Solicitor General
Office of the Minnesota Attorney
General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us

*Attorneys for State of Minnesota*

28

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*

Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Attorneys for State of Nevada*

**DAN A. RAYFIELD**
Attorney General of Oregon

By: */s/ Brian Simmonds Marshall*

Brian Simmonds Marshall*
Oregon Bar No. #196129
Senior Assistant Attorney General
Trial Attorney
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Brian.S.Marshall@doj.oregon.gov

*Attorneys for State of Oregon*

**JEFF JACKSON**
Attorney General of North Carolina

By: */s/ Daniel P. Mosteller*

Daniel P. Mosteller*
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Attorneys for State of North Carolina*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Sarah W. Rice*

Sarah W. Rice*
Deputy Chief, Civil Division
Office of the Rhode Island Attorney
General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 x2054
srice@riag.ri.gov

*Attorneys for State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*

Jonathan T. Rose*
Solicitor General
Rosemary M. Kennedy*
Assistant Attorney General
109 State Street
Montpelier, VT 06509
(802) 828-3171
jonathan.rose@vermont.gov
rosemary.kennedy@vermont.gov

*Attorneys for State of Vermont*

*\*Pro Hac Vice* Motions Forthcoming

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ William McGinty*

William McGinty*
Assistant Attorney General
Washington State Office of the
Attorney General
P.O. Box 4011
Olympia, WA 98504-0111
(360) 709-6027
William.McGinty@atg.wa.gov

*Attorneys for State of Washington*